Chris DAVIS, Appellant,

v.

FLEMING COMPANIES, INC., Appellee.

No. 94–3431.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1995.

Decided June 8, 1995.

Michael William Manners, Independence, MO, argued, for appellant.

Ann Mesle, Kansas City, MO, argued (Mark A. Ferguson, on the brief), for appellee.

Before McMILLIAN, Circuit Judge; HEANEY, Senior Circuit Judge; and MORRIS SHEPPARD ARNOLD, Circuit Judge.

HEANEY, Senior Circuit Judge.

Chris Davis filed an action against Fleming Companies, Inc., (Fleming) claiming that his employment was terminated in retaliation for reporting the sexual harassment of another employee, in violation of Title VII and the Missouri Human Rights Act. The district court granted summary judgment for Fleming and Davis appeals. We reverse and remand.

## BACKGROUND

Fleming hired Davis as a shipping clerk in September 1983. Beginning in December 1984 Davis received a "4" rating ("commendable") on a five-point scale. In December of 1987 his rating decreased to a "3" ("competent"). In January 1989 he was promoted to warehouse superintendent.

On October 8, 1991, Julie Martin, a management trainee, told Davis about an incident of possible sexual harassment by a Fleming manager, Ed Clark, during a recent company golf outing. Clark outranked Davis in the company hierarchy. Davis reported the incident to the Human Resources Department, in accordance with company policy, but he also disclosed details to others, in violation of the policy. In January 1992 Clark was fired. That same month Davis's performance rating decreased to a "2B" ("marginal"), and he received a lateral transfer to become supervisor of a smaller warehouse. On May 28, 1992, Davis was fired for allegedly poor job performance, leadership, and attitude. He subsequently filed an action for retaliatory discharge under Title VII and the Missouri Human Rights Act. The district court granted summary judgment in favor of Fleming and Davis appeals.

## DISCUSSION

In granting summary judgment for Fleming, the district court concluded that Davis had failed to make out a prima facie case of retaliatory discharge because he did not show that a genuine issue of fact existed concerning a causal link between his report of sexual harassment and his termination. In the alternative, the court ruled that even if a prima facie case were made, Fleming had

articulated a nonretaliatory, legitimate business reason for Davis's termination, and Davis failed to produce evidence to establish that the company's proffered reason was pretextual. We review de novo a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

■ In reviewing summary judgment we must decide whether the nonmoving party has presented evidence sufficient to show a genuine dispute of material fact, *i.e.,* evidence from which a reasonable jury could return a verdict for the nonmoving party. *Id.* at 247–48, 106 S.Ct. at 2509–10; Fed. R.Civ.P. 56(c). The nonmovant must present more than a scintilla of evidence and must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250, 252, 106 S.Ct. at 2511, 2512. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513.

■ To establish a prima facie case of retaliatory discharge, Davis must show that he engaged in protected activity under Title VII when he reported the alleged sexual harassment, that he thereafter was terminated, and that the termination resulted from his report of harassment. *See White v. McDonnell Douglas Corp.,* 985 F.2d 434, 437 (8th Cir.1993). It is undisputed that the first two elements of the prima facie case have been satisfied, *i.e.,* that Davis's report of sexual harassment was protected activity under Title VII, 42 U.S.C. § 2000e–3(a), and that he was terminated. To determine the appropriateness of summary judgment, then, we must review the evidence Davis presented to establish a causal connection between his protected activity and his termination by Fleming. If we conclude that Davis has carried his burden to set forth a prima facie case, we address whether as a matter of law Davis's evidence is insufficient to rebut Fleming's assertion that Davis was fired for substandard job performance. *See Rath v. Selection Research, Inc.,* 978 F.2d 1087, 1089–90 (8th Cir.1992) (once employer articulates legitimate business reason for discharge, burden shifts back to employee to prove the proffered reason is pretextual).

For both analyses we focus on whether Davis has presented evidence sufficient to support a jury finding that retaliation was the reason for his termination by Fleming.

■ Courts have recognized the difficulty in disposing of issues of discriminatory or retaliatory intent at the summary judgment stage. "Summary judgments should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion. All the evidence must point one way and be susceptible of no reasonable inferences sustaining the position of the nonmoving party." *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991) (citations omitted); *see also Gill v. Reorganized Sch. Dist. R–6, Festus, Missouri,* 32 F.3d 376, 378 (8th Cir.1994) (reviewing summary judgment "with caution in employment discrimination cases ... because intent is inevitably the central issue"). "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

Davis has offered the following evidence to support his position that there was a causal link between his report of harassment and his termination, and that deficient performance was merely a pretext for his termination. He states that prior to his October 8, 1991, report to Human Resources, he had never received complaints about poor job performance. Although his performance rating declined from a "4" to a "3" in 1987, the "3" rating of "competent" nonetheless reflects a fully satisfactory job performance. The company describes its performance category "3" as follows:

> This associate is doing a full, complete and satisfactory job. Performance is what is expected of a fully qualified and experienced person in the assigned position.
>
> You would not require significant improvement. If improvement does occur, it's a plus factor for your group's effectiveness. If it does not, you have no reason to complain.
>
> If all your associates were as good, your total group's performance would be com-

pletely satisfactory (in your judgment and your manager's, too).

You get few complaints from others with whom the associate's work interfaces.

Errors are few and seldom repeated.

Demonstrates a sound balance between quality and quantity.

Does not spend undue time on unimportant items, neglecting problems or projects that should have priority.

You feel reasonably secure in quoting the associate's inputs or recommendations.

Requires only normal supervision and follow-up and usually completes regular work and projects on schedule.

Has encountered almost all the activity [illegible] of the position and has proved quite capable in each.

You consider the associate a good solid member of your team and feel reasonably secure in making any kind of an assignment within the scope of the job and level.

App. 1143. Davis continued to receive raises while in category "3" as well as a promotion to warehouse superintendent in January 1989. *Id.* at 1144–49, 1168. He received three letters and a plaque applauding his job performance in April and October 1991. *Id.* at 1170, 1177, 1178.

On October 23, 1991, a couple of weeks after he reported the possible sexual harassment, Davis was summoned to a meeting at the Kansas City International Airport with Matthew Jonas, president of the company's Kansas City Division; Gary Capshaw, Operations Manager; and Mel Willming, Sr., an executive at Fleming's corporate headquarters in Oklahoma. Deposition of Christopher Davis (May 17, 1994), App. 389. Davis says that Willming told him that the meeting was to discuss his job performance and his "character assassination" of Clark, the perpetrator of the golf course incident. *Id.* at 391. When asked for specifics, however, Willming told Davis that neither Clark nor Scott Black, Davis's immediate supervisor, had a problem with his performance. *Id.* Willming also told Davis that Clark thought he would be a good candidate for promotion for two jobs that were opening up in two other cities. *Id.*

In his deposition Davis asserted that at this airport meeting, Jonas told him that Clark was running the team, and if Davis did not like it, he should get off the team. *Id.* at 393. Willming told him that the golf course incident never happened, that Davis was skating on very thin ice, that Davis should not have told anyone outside the Human Resources Department about the golf course incident, and that he should see the company counselor. *Id.* at 394–95, 404. No record of this meeting was put in Davis's personnel file.

A week later, on October 30, 1991, Davis was called in to meet with his supervisor, Scott Black, to discuss his job performance. Black's notes of the meeting, copies of which were sent to Capshaw and Willming, contain some positive comments about Davis's abilities and job performance but also mention some specific areas where he should be making extra efforts in his role as superintendent. *Id.* at 1164–66. According to Black's notes, he told Davis he did not know anything about any conversations Davis may have had with higher-level managers or executives at Fleming.

A few months later, in January 1992, for the first time in his tenure at Fleming, Davis received a "2B" job rating of "marginal" performance, was given no pay raise, and was transferred to a smaller Fleming warehouse. App. 1155. Davis stated that there were no complaints about his job performance at the new warehouse until an incident in May, which is discussed below. Davis's supervisor Scott Black testified that Mel Willming regularly called him to ask about Davis's performance after the transfer, and Black told him that Davis was doing a good job. Deposition of Robert Scott Black (June 23, 1994), App. 1132–33. Davis also offered as evidence two memos from Black to the warehouse management dated April 23, 1992, and May 4, 1992, thanking employees for improved results at the warehouse, as well as a March 1992 food safety audit showing a big improvement from the previous September. App. 1196, 1198, 1208.

On Friday, May 15, 1992, Davis participated in an inventory at the warehouse. At some point Davis spent about ten minutes

watching a program on the conference room television. Davis claims that one of the managers, Craig Kirchner, asked him to come watch that particular show. Davis Depo., App. 512. At work on Sunday Kirchner told Davis that the inventory had gone well. *Id.* Later in the week, however, Pete Peterson, one of Davis's supervisors who was also present at the inventory, concluded there were problems with the inventory. In a memo to Scott Black dated May 21, 1992, Peterson stated that Kirchner had told him that his supervisors were watching television in the office. When Peterson asked Davis about it, Davis said he only watched television for a little while. App. 189. Kirchner's memo, dated the same day and written at Peterson's request, stated that "in one instance" three management associates in charge of the inventory came up to the front office and were "briefly watching a program" on television and "[t]o my knowledge ... never became physically involved in taking inventory in the meat room." *Id.* at 188. Davis claims that the complaint about the inventory was a "set-up" by upper management. A week later, on May 28, 1992, Fleming terminated Davis for substandard performance.

Fleming argues that there is uncontroverted evidence of significant deterioration in Davis's job performance which predated his report of the golf course incident and which ultimately led to his termination. Therefore, the company asserts, there is no evidence from which a jury could infer retaliatory intent, and summary judgment was appropriate. We disagree.

The company relies in part on five handwritten memos by Scott Black in September 1991, a month before Davis reported the golf course incident, which outline some complaints by Davis about the company, as well as complaints about some of Davis's actions. App. 193–204. The memos show that Davis was unhappy with a new schedule under which he would have to work on Sundays; long workdays and sometimes having to work on his days off; unfair treatment in the past, such as when he was not given the time off he requested for his wedding and for the birth of his daughter; and having to work more Sundays than other employees. One

memo shows a complaint by a subordinate of Davis who wanted to leave work one day but sought permission from Black rather than Davis because, he said, Davis was complaining about his own days off and would not be inclined to "give anybody a break." Davis did not receive copies of any of the September memos. Davis disputes the import of these memos. He points out that Fleming has an "open door" policy that encourages employees to discuss their grievances with their supervisors. He also points to testimony by Black that some of Davis's concerns mentioned in the memos were justified. Black Depo., App. 1106–07.

Although these memos show that Davis had some grievances about the company and that there were some complaints about his own actions, they are not so strong a showing of deficient performance as to preclude a reasonable person from inferring a retaliatory intent or pretext from the other evidence presented by Davis. In addition, despite the decrease in his job performance rating from "4" to "3" in December 1987, a "3" rating nonetheless signals satisfactory performance as evidenced by the company's description of the "3" rating and the fact that Davis continued to receive pay raises and a promotion during that time.

Davis also offered evidence of increased scrutiny of his job performance commencing very shortly after he reported the golf course incident to Fleming's Human Resources Department. Just a couple of weeks after he made the report, Davis was summoned to a meeting at the airport with three of his supervisors, including an executive from Fleming headquarters. No record of the airport meeting was put in Davis's personnel file. Shortly thereafter he was called in for a performance review by Black, his immediate supervisor. About three months later, in January 1992, the same month the perpetrator of the golf course incident was fired, Davis's performance rating declined to a "2B" or "marginal" rating, he received no pay raise, and was given a lateral transfer to a smaller warehouse. Davis disputed that the decreased rating was justified.

Fleming vigorously disputes Davis's characterization of the September 1991 memos by

.Black and his descriptions of what transpired at the October 1991 airport meeting and the May 1992 warehouse inventory. The company's arguments may well keep Davis from persuading a jury that Fleming terminated him in retaliation for reporting the golf course incident which led to the dismissal of one of their fellow management executives rather than because of deficient job performance. Our task at the summary judgment stage, however, "is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Viewing the entire record and drawing all inferences in favor of Davis, as we must, we cannot conclude that as a matter of law the evidence is insufficient to support a jury finding of retaliation.

Finding the evidence presented by Davis such that a reasonable factfinder could resolve the dispute in his favor, we reverse the summary judgment for Fleming and remand the case for further proceedings.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

I believe that the district court correctly held that no reasonable person could find, on the basis of this record, that Mr. Davis was fired because of his participation in an activity protected by federal law. The evidence of a causal connection between Mr. Davis's reporting the alleged sexual harassment incident and his termination is, to my mind, simply too thin to support a verdict in his favor. The court has correctly summarized the evidence and stated the applicable legal principles, but I believe that it has erred in applying those principles to that evidence. There is nothing particularly suspicious about the timing of Mr. Davis's termination, nor is there any substantial evidence that his lower work ratings were related to any retaliatory motive. A jury verdict against Fleming in this case would be based on mere speculation and not reasonable inference.

In short, as the district court correctly pointed out, this is a case in which "the record as a whole could not lead a rational trier of fact to find for the nonmoving party," *Matsushita Electric Industrial Co. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and thus there is no genuine issue of fact in the case.

I therefore respectfully dissent.