_____

No. 95-3966

_____

Noorusadat S. Hossaini,            *
                                   *
          Appellant,               *
                                   *
v.                                 *
                                   *
Western Missouri Medical           *   Appeal from the United States
Center; Doris Kirkpatrick,         *   District Court for the Western
Chairperson; Harold Young,         *   District of Missouri.
Trustee; Linda Gentry,             *
Trustee; Dr. M. Letterer;          *
Hugh Smith, Trustee,               *
                                   *
          Appellees.               *


_____

          Submitted:  September 11, 1996

             Filed:  October 8, 1996
_____

Before BOWMAN, BRIGHT, and JOHN R. GIBSON, Circuit Judges.

_____

BRIGHT, Circuit Judge.

     Noorusadat  S.  Hossaini  brought  this  action  against  her  former
employer, Western Missouri Medical Center (WMMC) and the WMMC Board of
Trustees (the Board), alleging employment discrimination based on her
national origin and unlawful retaliatory action in violation of 42 U.S.C.
§ 2000e, et seq. (Title VII) and the Missouri Human Rights Act (MHRA), Mo.
Rev. Stat. §§ 213.055 and 213.070.  The district court granted summary
judgment in favor of WMMC because Hossaini failed to produce evidence
showing that WMMC's proffered reasons for terminating her employment were
pretext for unlawful discrimination.  Hossaini appeals.  After a full
review of the record, we reverse and remand.

## I. BACKGROUND

Hossaini, an Iranian lawfully residing in the United States, is an ultrasound technologist. She worked at WMMC, a county hospital, from June 19, 1992, until her termination on November 1, 1993. Hossaini worked under the immediate supervision of Randy Whitcomb, the Director of Radiology at WMMC. She also worked with Susan Black, another ultrasound technologist.

When Hossaini applied for the ultrasound technologist position at WMMC she indicated that she had training in general and vascular ultrasound techniques. Although her resume stated that she was certified in general and vascular ultrasound, she claims she informed Whitcomb that she received little hands-on training in vascular ultrasound techniques. According to Hossaini, Whitcomb told her that WMMC hired an outside contractor to perform all the vascular ultrasound exams.

In September 1992, Whitcomb approved Hossaini's request to attend the American Registry of Diagnostic Medical Sonographers registry review course. Hossaini attended the course, but did not pass the examination to become a registered ultrasound technologist.

Hossaini received the first of two performance evaluations from Whitcomb in September 1992, and was rated on thirty-one different job responsibilities. Hossaini received scores indicating that she "need[ed] improvement" on six of the responsibilities. Hossaini received scores indicating that she met WMMC's requirements on the remaining twenty-five responsibilities. Whitcomb did not find that she failed to meet the minimum requirements of any responsibility, nor did he find that she exceeded the requirements of any responsibility.

In February 1993, WMMC decided to begin performing vascular ultrasounds in its own Ultrasound Department by May 1993, instead of using the outside contractor.

Later in February, Hossaini asked Whitcomb for leave without pay so she could travel to Iran to arrange medical treatment for her father. Whitcomb refused her request and became angry. Hossaini claims that Whitcomb yelled at her, "why [is] everything so different with you damn foreigners," and criticized her for not taking vacation time like American employees. Whitcomb admits raising his voice at Hossaini, but denies using derogatory language.

Hossaini then went to Dennis Long, Director of Human Resources at WMMC, and requested leave to go to Iran. Hossaini told Long that Whitcomb denied her request and became angry. Hossaini claims she also told Long about Whitcomb's derogatory remarks. According to Hossaini, Long acknowledged that Whitcomb's conduct was improper and approved Hossaini's leave.

According to Hossaini, when she returned from Iran, other employees told her that Whitcomb said he was going to "get even" with her for going behind his back by seeking leave time from Long. Hossaini also claims she began receiving threatening phone calls and letters. She alleges that the male caller knew her name, street address and post office box number, and told her to leave town. Hossaini claims she had an unlisted phone number known only to her family and WMMC. The letters ordered her to "[r]esign and move out or you will get hurt" and "[l]eave town or I [will] get someone to hurt you." The letters bore a "Columbia GMF" postmark and were allegedly mailed from Sedalia, Missouri. Whitcomb resided in Sedalia.

On April 22, 1993, Susan Black, Hossaini's co-worker, became the "lead" ultrasound technologist. Hossaini claims that

throughout her employment Black made fun of Hossaini's accent and imitated it. Hossaini also claims that Black repeatedly made derogatory comments about foreigners, specifically complaining about foreigners taking jobs away from Americans.

Hossaini received her second performance review from Whitcomb on May 14, 1993. In this review, Whitcomb gave Hossaini similar scores as the first review, but he noted that Hossaini had not become proficient at performing vascular ultrasounds. He told Hossaini she had thirty days to become proficient at this procedure.

Whitcomb subsequently extended this deadline and offered to provide Hossaini with thirty-five volunteers to practice vascular ultrasounds. She refused, allegedly because she believed she needed more practice. Instead, Hossaini requested an independent evaluation of her vascular ultrasound skills. The evaluator concluded that Hossaini's "anatomy and scanning skills are good," but recommended that Hossaini receive three months of daily practice to become proficient. Hossaini then located five hospitals that would allow her to train in their facilities. She asked Whitcomb to allow her to train at other hospitals, but he refused. According to Whitcomb, such training would be costly and he preferred that Hossaini learn the procedure on WMMC's equipment. Neither party offered evidence regarding whether the other hospitals used the same equipment as WMMC.

On May 18, 1993, Hossaini met with Gregory Vinardi, WMMC's C.E.O., and complained that she was being harassed and discriminated against because of her national origin and that she believed it was against the law. On June 15, 1993, Hossaini sent a follow-up letter to Vinardi about the harassment and discrimination.

In June 1993, Black began keeping a list of substandard ultrasound exams performed by Hossaini. Black recorded the exam information on note cards she kept at her home and then developed her list from the note cards. Black did not keep a similar list for any other employee.

On July 7, 1993, Hossaini filed a complaint with the Equal Employment Opportunity Commission (EEOC) and the Missouri Human Rights Commission alleging discrimination on the basis of national origin.

On July 30, 1993, WMMC began investigating the disappearance of seven ultrasound films and a logbook used to document ultrasound exam information. The missing films allegedly documented substandard exams performed by Hossaini and corresponded with Black's list. WMMC performed a random inventory of the ultrasound films and concluded that no other films were missing. As part of the investigation, WMMC interviewed thirteen employees about the missing items and four speculated that Hossaini may have taken the films and logbook. Several employees offered alternative explanations for the items' absence. These alternative explanations ranged from naming other employees with access to the films and logbook, to speculating whether someone misfiled the films. Hossaini denies taking the films and logbook. No one witnessed Hossaini take the films or logbook, nor did anyone find the items in her possession.

In addition, Black claims she no longer has the note cards or the list of Hossaini's substandard exams. She claims she either lost or threw away the note cards and the list.

On October 5, 1993, Vinardi asked Hossaini to take a polygraph examination in connection with WMMC's investigation. Hossaini refused. On November 1, 1993, WMMC notified Hossaini that she was

terminated as of November 2, 1993.  WMMC told her that the termination resulted from her refusal to take the polygraph exam.

On December 29, 1993, Hossaini commenced this action claiming discriminatory treatment and retaliation.  WMMC and the Board moved for summary judgment contending that WMMC terminated Hossaini for two legitimate, nondiscriminatory reasons:  (1) because it believed she stole the ultrasound films and logbook, and (2) because she could not adequately perform vascular ultrasounds.  The district court granted summary judgment because Hossaini failed to generate a genuine issue of material fact on the issue of pretext.  In addition, the Board moved for summary judgment claiming that it was not an "employer" under Title VII or the MHRA. Because the district court granted summary judgment, it decided that whether the Board qualified as an "employer" under Title VII was moot and, therefore, refused to rule on the matter.  Hossaini appeals.

## II.  DISCUSSION

### A.

We review the district court's grant of summary judgment de novo, applying the same standards as the district court.  Garner v. Arvin Indus., Inc., 77 F.3d 255, 257 (8th Cir. 1996).  Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The court cannot weigh the evidence or grant summary judgment merely because it believes the nonmoving party will lose at trial.  See id. at 249.  In addition, we recognize the difficulty of disposing of issues of discriminatory

-6-

or retaliatory intent at the summary judgment stage, particularly after a plaintiff establishes a prima facie case.  Davis v. Fleming Companies, Inc., 55 F.3d 1369, 1371 (8th Cir. 1995); Gill v. Reorganized Sch. Dist. R-6 Festus, Mo., 32 F.3d 376, 378 (8th Cir. 1994).

The district court properly analyzed Hossaini's Title VII claims under the "burden shifting" analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The McDonnell Douglas analysis also applies to claims under the MHRA.  McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995) (citing Midstate Oil Co. v. Missouri Comm'n on Human Rights, 679 S.W.2d 842, 845-46 (Mo. banc 1984)).  Accordingly, Hossaini must establish a prima facie case of discrimination, then the burden of production shifts to WMMC to provide a legitimate, non-discriminatory explanation for her discharge.  See Roxas v. Presentation College, 90 F.3d 310, 316 (8th Cir. 1996) (citation omitted).  If WMMC offers a legitimate, nondiscriminatory explanation, the burden of production shifts back to Hossaini to demonstrate that WMMC's reason is a pretext for discrimination.  Roxas, 90 F.3d at 316.  "Finally, [Hossaini] at all times carries the burden of persuasion to show that the adverse employment action was motivated by intentional discrimination."  Garner, 77 F.3d at 257 (citations omitted).

We agree with the district court that Hossaini satisfied the elements of a prima facie case and that WMMC articulated two nondiscriminatory reasons for terminating her.  First, WMMC claimed it fired Hossaini because it reasonably believed she stole the ultrasound films and logbook.  Second, WMMC stated that Hossaini could not adequately perform vascular ultrasounds.

Because WMMC offered legitimate, nondiscriminatory reasons for terminating her, the burden of production shifts back to Hossaini to demonstrate the existence of a factual issue that these

proffered reasons were a pretext for discrimination. See Roxas, 90 F.3d at 316. Hossaini can rely on evidence offered to establish her prima facie case to demonstrate discriminatory motive. Roxas, 90 F.3d at 316 n.3; Rothmeier v. Investment Advisors, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996). The standard for Hossaini "to survive summary judgment required only that [she] adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence did not directly contradict or disprove defendant's articulated reasons for its actions." Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 n.8 (8th Cir. 1994).

Viewing the evidence in the light most favorable to Hossaini, we believe she offered sufficient evidence demonstrating a dispute regarding issues of material fact. First, Hossaini offered evidence from which a reasonable person could infer that WMMC's suggestion that it fired Hossaini because it believed she stole the ultrasound films and logbook was pretextual.

The district court relied on Gill v. Reorganized Sch. Dist. R-6 Festus, Mo., 32 F.3d 376 (8th Cir. 1994), in which a superintendent terminated the plaintiff based on a supervisor's report indicating that the plaintiff engaged in misconduct. Id. at 379. The plaintiff, however, merely alleged that she never participated in such misconduct and the only evidence the plaintiff offered to show discriminatory motive was the superintendent's awareness of her race. Id.; see also Roxas, 90 F.3d at 317-18 (stating that plaintiff's reliance on other employees' biased statements to demonstrate pretext failed because evidence lacked a causal nexus between employees' statements and employer's decision). This court affirmed summary judgment because the plaintiff's mere assertion that she never participated in the misconduct fell short of an affirmative allegation that discriminatory animus motivated the superintendent's decision or the supervisor's report. Gill, 32 F.3d at 379.

-8-

In this case, Hossaini offered evidence that WMMC launched its investigation into the missing films and logbook less than three months after she complained to Vinardi about discrimination, less than two months after she reduced those complaints to writing, and less than one month after she filed her complaint with the EEOC.  Unlike the situation in Gill, Hossaini claimed several people at WMMC, including Long, Vinardi and Whitcomb, knew she made allegations of discrimination and harassment before WMMC began investigating the alleged misconduct.  A reasonable person could infer a discriminatory motive from the timing of the investigation.

In addition, unlike the plaintiff in Gill, Hossaini offered evidence that Whitcomb not only knew about her national origin, but made derogatory comments about her nationality and threatened to get even with her.  See McLaughlin, 50 F.3d at 512 (stating that in certain circumstances "discriminatory statements made by supervisors may be evidence of discriminatory intent").  She also offered evidence from which a reasonable juror might infer that Whitcomb participated in the mailing of the threatening letters.  This evidence could support the conclusion that Whitcomb capitalized on the disappearance of the films and logbook to retaliate against Hossaini for her complaints to Long and Vinardi, or to ensure her termination out of discriminatory animus.

Hossaini also offered evidence that the list of missing films originated with Black, who allegedly made derogatory statements about foreigners and ridiculed Hossaini's accent.  Black claimed she lost or discarded the list and note cards.  Black never kept similar lists about other employees.  This evidence could create an inference that Black's animus against Hossaini's nationality played a role in the charges relating to the missing films and logbook.  Such evidence, therefore, bears on pretext.

Second, Hossaini offered evidence from which a reasonable person could infer that WMMC's assertion that she could not perform

vascular ultrasounds adequately, also served as a pretext for discrimination. This court stated that "[s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." Kobrin v. University of Minn., 34 F.3d 698, 703 (8th Cir. 1994). In Hossaini's case, WMMC initially terminated her because she refused to take the polygraph exam. The hospital did not rely on her lack of proficiency at performing vascular ultrasounds for its decision. Only later, presumably after Hossaini filed suit, did WMMC proffer its second reason for terminating her. Based on this evidence, a reasonable person could infer that WMMC claimed it fired Hossaini because she could not perform vascular ultrasounds, after she brought suit, in an effort to strengthen its case and avoid liability.

In addition, in Davis v. Fleming Companies, Inc., 55 F.3d 1369 (8th Cir. 1995), the employer relied on a supervisor's notes purportedly documenting the employee's deteriorating job performance to support the decision to fire the employee. Id. at 1373. This court found that the supervisor's notes showed a pattern of deteriorating performance, but they did not preclude a reasonable inference of a retaliatory intent or pretext from other evidence. Id. For example, the plaintiff offered evidence that his performance ratings continued to reflect satisfactory work. Id. Furthermore, a genuine issue of material fact existed because the employer contested the plaintiff's characterization of the supervisor's motivation for writing the memos. Id. at 1373-74.

As in Davis, Hossaini never received performance reviews indicating substandard work. She also offered evidence that performing vascular ultrasounds was not part of the job requirements at the time WMMC hired her. In addition she offered evidence that she tried to receive training in vascular ultrasounds at other hospitals. Although Whitcomb criticized her alternative as costly and less beneficial to WMMC, at the summary judgment stage we must give Hossaini the benefit of inferring the cost

effectiveness of such training.  Furthermore, the district court recognized that Hossaini alleged sufficient facts demonstrating a genuine issue for trial about whether she was qualified for the position.

The district court and WMMC rely on notes Whitcomb kept that allegedly document Hossaini's substandard performance.  WMMC's "arguments may well keep [Hossaini] from persuading a jury that [WMMC] terminated [her] in retaliation . . . rather than because of deficient job performance," but at the summary judgment stage we cannot weigh the evidence.  Davis, 55 F.3d at 1374.  Looking at the entire record, therefore, one finds some evidence capable of supporting Hossaini's claim of pretext.

To grant summary judgment on this record would be inappropriate, "especially because this . . . case is based largely on circumstantial evidence and the relative merit of each party's case depends significantly on credibility."  Hase v. Missouri Div. of Employment Sec., 972 F.2d 893, 897 (8th Cir. 1992), cert. denied, 508 U.S. 906 (1993).  Without weighing or judging the credibility of the evidence offered, one cannot say that all the evidence points favorably only to the employer.  Instead, after reviewing the whole record, some of the evidence permits reasonable inferences that can favor Hossaini.

**B.**

Hossaini also asks us to direct the district court to find that the Board falls within Title VII's and the MHRA's definition of "employer." The Board moved for summary judgment arguing that it was not an "employer" for purposes of Title VII or the MHRA.  The district court decided that the issue became moot after it determined that Hossaini could not recover on her claims.

To rule on this issue requires not only interpreting the statutory language of Title VII, but also analyzing the factual setting and characteristics of the Board's relationship to WMMC and Hossaini. The district court is better suited to undertake such a fact specific exercise. Therefore, we decline to rule on whether the Board falls within the definition of "employer," but remand that issue to the district court.

### III.  CONCLUSION

Accordingly, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.