**Robert H. HEIMBACH, Plaintiff,**

v.

**RIEDMAN CORPORATION,
Defendant.**

**No. 99–1295 (JRT/RLE).**

United States District Court,
D. Minnesota.

July 27, 2001.

George G. Eck, Michael Iwan, Dorsey & Whitney, LLP, Minneapolis, MN, for plaintiff.

Kevin P. Staunton, Jodi L. Johnson, Hinshaw & Culbertson, Minneapolis, MN, for defendant.

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

Plaintiff Robert Heimbach ("Heimbach") brings claims against defendant Riedman Corporation ("Riedman") for breach of contract, unjust enrichment, defamation, intentional infliction of emotional distress, as well as claims for discrimination and retaliation pursuant to the Americans with Disabilities Act and the Minnesota Human Rights Act. The claims arise in an employment context and result from Riedman's termination of Heimbach as an insurance producer. This case is now before the Court on defendant's motion for summary judgment on all claims. The Court will grant defendant's motion as to plaintiff's claims for defamation and intentional infliction of emotional distress. However, because plaintiff has demonstrated that genuine issues of material fact exist on his claims for breach of contract, unjust enrichment, discrimination and retaliation,

the remainder of defendant's motion for summary judgment is denied.

## BACKGROUND

Riedman is an insurance agency with offices located throughout the country. Heimbach was an insurance agent or "producer" for Riedman until his termination in the summer of 1999. Prior to his employment with Riedman, plaintiff ran the Robert H. Heimbach Insurance Agency in Duluth, which he sold to First Bank Systems ("First Bank") in 1985.[1] After the sale to First Bank, Heimbach continued to manage the office until 1996. In 1996, Riedman purchased the agency from First Bank, along with 10 other agencies throughout Minnesota.

Following Riedman's purchase of the agency from First Bank in 1996, Heimbach entered into an employment agreement with Riedman. The term of the contract was from March 1, 1996 through February 28, 2001. The agreement guaranteed that Riedman would be paid an annual salary of $49,500 plus a 25% commission on all sales of new commercial lines of insurance. The agreement also gave Heimbach an automobile allowance and other fringe benefits, including eligibility for a year-end bonus. The agreement stated that Heimbach could only be terminated "should [he] willfully breach, habitually neglect or become incapable of carrying out the duties which he is required to perform under the terms of this Agreement." The agreement also required that Heimbach receive written notice of any termination.

When Riedman purchased the Duluth office from First Bank, Heimbach was the only producer that stayed on in the office and was named manager of the Duluth Branch. He remained the manager and sole producer in the Duluth office from March of 1996 until June of 1998. In early 1998, Riedman acquired another insurance agency in Duluth and merged it with the branch managed by Heimbach. When the offices were merged, Heimbach was removed from his manager position and replaced by Jack Ball ("Ball"), manager of the agency acquired by Riedman in 1998.

In or about June 1998, Heimbach also informed certain members of Riedman management that he had been diagnosed with what doctors believed to be multiple sclerosis. Although Heimbach had been diagnosed with a neurological dysfunction of some kind in 1995, it was not until 1998 that his doctors came to believe that the condition was multiple sclerosis. While Heimbach had experienced some outward symptoms of his condition from at least 1995, Heimbach alleges that in or about 1998 he began to experience noticeably increased manifestations of his medical condition. Heimbach's symptoms include numbness in his limbs, difficulty walking, spacity in his limbs, balance problems, and bladder and erectile dysfunction .[2] In August 1998, Heimbach visited the Mayo Clinic to receive treatment for his worsening condition and made additional visits to the Mayo Clinic in September 1998. In May 1999, Heimbach informed the Regional Manager of Riedman, Dale Humphreys ("Humphreys"), about his condition and explained that he might need to take some time off in the afternoons if his symptoms became unmanageable.[3] Heimbach contends that between late 1998 and mid–1999 he was substantially limited in his ability to walk, stand, reproduce and control his evacuative functions.

---

1. Plaintiff has been an insurance agent in Duluth for approximately 30 years.

2. Plaintiff is being medicated to alleviate or control some of these symptoms.

3. Heimbach disclosed his medical condition to various members of the Riedman management team, including Jack Ball and Dave Parker.

The parties adamantly dispute the reason why Heimbach was demoted from manager when the two Duluth officers merged and why he was eventually terminated. Defendant contends that Heimbach's performance at Riedman since 1996 was sub-par and that his demotion was a result of poor management skills and poor performance. Plaintiff contends that his performance at Riedman was far from deficient and that he, in fact, had been recognized shortly before his termination for outstanding production of new business.

Riedman evaluates the performance of both its individual producers and its branch offices each year. Individual financial performance is measured by the total commissions generated from sale of commercial policies ("book of business") and commissions generated from sales of new policies. Branch offices are evaluated in five categories: (1) retention; (2) growth; (3) collection days; (4) commissioner per employee; and (5) new business per employee. The offices are then ranked relative to all other Riedman offices throughout the country.

In 1996, Heimbach generated $6,399 in new business commissions and $103,290 in total commissions. In 1997, he produced $10,647 in new commissions and $117,036 in total commissions, and in 1998 he generated $16,072 in new commissions and $101,672 in total commissions. In the two years that Heimbach managed the Riedman office, the branch ranked 43, 41, 47, 51, and 51 out of 61 branches in the respective categories outlined above. This performance was not sufficient to qualify Heimbach or the Duluth branch office for a bonus in 1996 or 1997. Riedman maintains that its producers are expected to generate at least $20,000 to $25,000 in new commissions each year and that after a reasonable time in the business should maintain at least a $200,000 book of business.[4] This standard, however, does not seem to be articulated to Riedman's producers in any formal way.

Heimbach paints a drastically different picture of his performance for Riedman. Plaintiff explains that he encountered initial difficulties in operating the Riedman office because the company had no ties to the Duluth area and no local name recognition when it purchased the agency from First Bank.[5] Heimbach also alleges that he struggled with Riedman's corporate decision-making process, especially as it related to personnel issues. This, he contends, resulted in difficulty staffing the office. Heimbach points out that in 1996 he ranked 94th out of more than 200 Riedman producers in total book of business and that in 1997 he was 99th out of more than 200 producers. In addition, Heimbach contends that after the merger, his book of business equaled the combined book of business of the office manager and the other producer in the Duluth office. Heimbach also notes that in 1999 he was on pace to generate a book of business in excess of $150,000 and that two weeks before his termination he ranked 8th out of 250 producers in new business generated and that he had accounted for more than 70% of the total commissions for the Duluth office in 1999.

In support of its decision to demote Heimbach from branch manager, Riedman maintains that at least two letters were sent to Heimbach in 1997 from the Regional Manager articulating some concern

---

4. Defendant acknowledges that it does not expect its newly acquired offices to perform at the same level as established offices and that new offices and producers are given about two years to stabilize their business.

5. Riedman is a Rochester, New York based company.

about his performance. Riedman also cites a problem that Heimbach had with an employee, in which Heimbach documented performance issues in her file in alleged retaliation for an on-going argument.

After the demotion, Riedman maintains that Heimbach continued to exhibit job performance problems. Riedman alleges that Heimbach did not give proper attention to certain client files and that at one point he missed a client meeting. After these continuing difficulties, Riedman claims that the parties began discussing the possibility of Riedman buying out Heimbach's book of business. During the course of those negotiations, Heimbach notified Riedman management that he believed he had a case against it for disability discrimination. One to two days after he rejected Riedman's offer to purchase his book of business, Heimbach was put on probation. The following day he was terminated after allegedly telling a lie about one of his files.

Heimbach provides a different version of the facts leading up to his termination. He notes that Riedman admits that management was not considering terminating him as of June 1998. He also notes that Riedman's increased questioning of his conduct and performance coincides with an increase in the outward manifestations of symptoms of his medical condition. Heimbach also points out that Ball, the producer who was named manager of the Duluth branch when Riedman merged its offices in 1998, had been a direct competitor of his in the past and that the two did not have a good relationship. Heimbach asserts that he was treated more harshly by Ball than was the other producer in the Duluth office, even though Heimbach was by far the most productive agent in the office.

Heimbach also asserts that the first time negative memos and letters were placed in his personnel file was in September 1998, the same month he visited the Mayo Clinic on a number of occasions. Heimbach also alleges that despite being told by upper management that he would be allowed to take breaks when necessary because of his symptoms, Ball put a number of notes in his personnel file related to poor work attendance. With respect to the time period immediately preceding his termination, Heimbach asserts that in June 1999 he was approached by Ball with a recommendation that he consider changing his compensation scheme so that he be paid based only on commissions, rather than a salary in addition to commissions. Heimbach argues that he agreed to consider the change only because of the deteriorating situation in the Duluth office. However, Heimbach maintains that he did not endorse the idea, but that Ball followed the meeting with a memo stating that Heimbach was enthusiastic about the idea—in essence, setting Heimbach up to be forced out of the company.

On June 25, 1999, a conference call was held between Heimbach and Riedman representatives to inform Heimbach that he was not meeting company expectations. Heimbach asked about the offer Ball had previously discussed with him concerning the buyout and was told that it was no longer on the table. Heimbach then asked whether Riedman would still consider letting him purchase some or all of his book of business. Riedman officials at the meeting acknowledged that such an option was still a possibility, but that it would need to be run up the chain of command.

Heimbach maintains that while reflecting on these events he became increasingly troubled about the differential treatment he had received by Riedman and that the series of events leading up to that point coincided with the deterioration of his physical health. As a result, he consulted an attorney to discuss his situation. On July 8, 1999, Heimbach wrote a letter to

the Riedman regional manager explaining that he believed he was being discriminated against because of his disability. Shortly thereafter Heimbach was given an offer to sell his book of business for $50,000 and asked to resign. Heimbach rejected the offer and was then told he was being put on probation. A few days later he was terminated because of a dispute about a bad credit file.

This action was later commenced[6] and Riedman now moves for summary judgment on all counts.

## DISCUSSION

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment Ashall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.@ Fed. R.Civ.P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of

material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076 (8th Cir .1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir.1981).

### II. Breach of Contract

■ Plaintiff alleges claims against Riedman for breach of his employment agreement. Heimbach contends that Riedman breached the agreement by failing to give him prior written notice of his termination and by terminating him for a reason other than those enumerated in the employment agreement. Defendant moves for summary judgment on this claim arguing that Heimbach, in fact, willfully breached the employment agreement and habitually neglected his duties at Riedman. Riedman maintains that it was entitled to terminate Heimbach pursuant to the terms of the agreement.

Because material fact issues exist concerning whether Riedman was entitled to terminate Heimbach under the circumstances presented in this case, defendant's motion for summary judgment on this claim is denied. Plaintiff's employment agreement provides that he may be terminated **only** if he "willfully breach[es], habitually neglect[s] or become[s] incapable of carrying out the duties which he is required to perform" under the agree-

---

**6.** In October 1999, this Court granted plaintiff's motion for a temporary restraining order, enjoining defendant from enforcing the restrictive covenant contained in plaintiff's employment agreement.

ment. Riedman relies on evidence that Heimbach failed to properly service customers and to collect accounts receivable to justify the termination. Riedman argues that letters from Ball, Humphreys and Dave Parker ("Parker") to Heimbach support its contention. However, based on the entire record before the Court, these letters do not provide a sufficient factual basis to conclude that Heimbach breached the employment agreement as a matter of law.

Riedman's decision to use the terms "willfully" and "habitually" when drafting the employment agreement cannot be overlooked. The inclusion of those standards raise an almost inherent factual question, except in the most egregious situations. *See, e.g., Levin v. COMB Co.,* 441 N.W.2d 801, 805 (Minn.1989) (explaining that willfulness standard in fair labor standards act "almost certainly ... demand[s] submission ... to the fact finder"). Determinations of whether Heimbach willfully breached the agreement or habitually neglected his duties are questions of fact for the jury, and not questions for the Court to resolve on summary judgment. This is especially true here, where the facts must be viewed in the a light most favorable to the nonmoving party. Accordingly, defendant's motion for summary judgment on this claim is denied.

### III. Discrimination Claim

Plaintiff has asserted claims of disability discrimination pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, and the Minnesota Human Rights Act, Minn.Stat. § 363.01(1). Heimbach con-

tends that defendant discriminated against him by terminating him because of his disability. Defendant moves for summary judgment on this claim arguing that Heimbach cannot make out a prima facie case of discrimination because he cannot demonstrate that he has a cognizable disability. Defendant also argues that even in the event that Heimbach can show a disability, it had a legitimate nondiscriminatory reason for terminating Heimbach.

The Court finds that Heimbach has at least created a sufficient fact question as to whether he is disabled within in the meaning of the ADA or MHRA and whether he suffered adverse employment action because of that disability. As a result, defendant's motion for summary judgment on plaintiff's discrimination claim is denied.

■ In order to make out a prima facie case under the ADA and the MHRA [7] plaintiff must show that he: (1) had a disability within the meaning of the ADA or MHRA; (2) that he was qualified to perform the essential functions of this job, with or without reasonable accommodation; and (3) that he suffered an adverse employment action because of his disability.[8] *Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 959 (8th Cir.2000). If Heimbach satisfies this initial burden, the burden then shifts to Riedman to show a legitimate, nondiscriminatory reason for the challenged action. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. The burden will then shift back to Heimbach to demonstrate that the proffered reason was pretexual. *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 120 S.Ct. 2097, 2106,

---

7. For the purposes of this motion, the ADA and MHRA claim are analyzed under the same standard. *Young v. Warner–Jenkinson Co.,* 152 F.3d 1018, 1021 n. 4 (8th Cir.1998) (en banc).

8. There appears to be no direct evidence of discrimination in the record. Plaintiff must

therefore satisfy his burden by presenting indirect evidence under the *McDonnell Douglas* framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (indirect evidence of discrimination).

147 L.Ed.2d 105 (2000). "In sum, when the employer produces a nondiscriminatory reason for its actions, the prima facie case no longer creates a presumption of unlawful discrimination." *Ryther v. KARE 11*, 108 F.3d 832, 837 (8th Cir.1997). "The elements of a prima facie case remain, however, and if they are accompanied by evidence of pretext and disbelief of the defendant's proffered explanation, they may permit the jury to find for plaintiff." *Id.*

In order to demonstrate that he is disabled, Heimbach must show that he (A) has a physical or mental impairment that substantially limits one or more of his major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment. 42 U.S.C. § 12102(2). An impairment "substantially limits" a major life activity if it significantly restricts the condition, manner, or duration under which an individual can perform such an activity as compared to the general population and as determined by the nature and severity of the impairment, its duration, and its long-term impact. 29 C.F.R. § 1630.2(j). Several factors are to be evaluated in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long term impact. 29 C.F.R. § 1630.2(j)(2)(i)–(iii). A major life activity includes such things as walking, standing, working, and the ability to reproduce. 29 C.F.R. § 1630.2(i).

Plaintiff has proffered sufficient evidence to create a material fact issue concerning whether he is disabled within the meaning of the ADA and MHRA. Based on the evidence currently in the record, a jury could reasonably determine that Heimbach is disabled. Heimbach has introduced evidence of a relatively significant impairment that has lasted more than five years and could have serious long term consequences. Heimbach has also shown that he has difficulty walking, has numbness and spacity in his limbs, has balance problems, and has bladder and erectile dysfunction.[9] This evidence is sufficient to create a jury question as to whether Heimbach is substantially limited in such major life activities as walking, reproduction or work.

There seems to be no dispute between the parties that Heimbach was qualified to perform his job functions and that he suffered an adverse employment action. Defendant raises an issue concerning the causal connection between the adverse employment action and Heimbach's alleged disability. However, there is sufficient evidence in the record for a jury to find a causal connection between plaintiff's medical condition and the adverse employment action.

The evidence, when viewed most favorably for Heimbach, as it must be at this stage of the proceedings, indicates that adverse memos and letters began to appear in Heimbach's personnel file at the same time he began making visits to the

---

**9.** The Court notes that a number of jurisdictions have found that multiple sclerosis constitutes a cognizable disability under the ADA. *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir.1998) ("[t]here appears to be no dispute that [plaintiff], as a result of her confirmed diagnosis of multiple sclerosis is considered a person with a disability within the meaning of the ADA"); *Braunling v. Countrywide Home Loans Inc.*, 220 F.3d 1154, 1157 (9th Cir.2000) (concluding that plaintiff who was diagnosed with multiple sclerosis and suffered poor ambulation ability and extreme fatigue fit the definition of "disabled" under the ADA); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir.1999) (plaintiff diagnosed with multiple sclerosis and suffering from numbness, pain, fatigue, cramps, blurred vision, fainting spells, forgetfulness, loss of balance and incontinence disabled within the meaning of the ADA).

Mayo Clinic because of increased outward symptoms of his condition. Additionally, Heimbach generated the most business and had a greater book of business than the other producers in the Duluth officer, but was the only producer that Riedman disciplined and eventually terminated. Further, Riedman acknowledges that it did not even contemplate terminating Heimbach as of June 1998, the time when he began to experience an increase in outward manifestations of his medical condition. Within approximately one year of that time Heimbach was terminated. The questionable time period in which Heimbach was disciplined and then terminated provides further evidence upon which a jury could rely. *Hossaini v. Western Missouri Med. Ctr.,* 97 F.3d 1085, 1089 (8th Cir.1997). Accordingly, Heimbach has at least created triable issues of fact to present to the jury regarding his prima facie case.

Defendant also argues that it had a legitimate, nondiscriminatory reason to terminate Heimbach; namely, his sub-par performance, failure to get along with other employees, and failure to perform his general job duties. This explanation for Heimbach's termination again shifts the burden to plaintiff to show pretext. Again, Heimbach has at least created a material fact issue regarding pretext. In addition to the reasons explained above, the failure of Riedman to provide a contemporaneous explanation for Heimbach's termination also supports a finding of pretext. *Kobrin v. University of Minnesota,* 34 F.3d 698, 703 (8th Cir.1994) ("substantial changes over time in employer's proffered reason for its employment decision supports a finding of pretext"). Defendant's motion for summary judgment on plaintiff's discrimination claim is therefore denied.

### III. Retaliation Claim

Plaintiff also asserts a retaliation claim against defendant pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12203, and the Minnesota Human Rights Act, § 363.03(7). Heimbach alleges that his termination was in retaliation for telling Riedman management that he believed he had been discriminated against on the basis of his disability. Riedman argues that summary judgment is appropriate on this claim because Heimbach cannot show a causal connection between the protected conduct and his termination.

■ Just as with plaintiff's discrimination claim, the burden is initially on plaintiff to make a prima facie case by showing: (1) he engaged in statutorily protected conduct; (2) that he experienced adverse employment action; and (3) there is a causal connection between the conduct and Riedman's actions. *Smith v. Riceland Foods,* 151 F.3d 813, 818 (8th Cir.1998). The parties do not dispute that Heimbach engaged in statutorily protected conduct or that he experienced adverse employment action. Riedman only disputes that there is a causal link between the two.

■ With respect to the causation issue, the Eighth Circuit has found that a causal connection can be established solely on the basis of temporal proximity if the protected action and adverse employment action occur within a short period of time. *Bergstrom–Ek v. Best Oil Co.,* 153 F.3d 851, 859 (8th Cir.1998). Here, the proximity between Heimbach threatening legal action and his termination at least raises an inference of retaliation sufficient to demonstrate a prima facie case. In addition to the evidence of the temporal proximity, plaintiff has proffered evidence to suggest that Ball either told or suggested to other employees that Heimbach was going to be fired before the decision was made. There is also evidence that Heimbach was not informed at the time of his firing, with any specificity, why he was being fired. This evidence is not only

sufficient to make a prima facie case, but also to call into question Riedman's articulated rationale for the termination. Riedman's motion for summary judgment on plaintiff's retaliation claims is therefore denied.

## IV. Defamation Claim

Plaintiff has asserted a defamation claim against Riedman for comments made by Ball and by customer service representatives at the Duluth branch. Heimbach argues that Ball's statements that he lied constantly and was a professional liar were defamatory. He also argues that Riedman's conduct of telling customers that they did not know how Heimbach could be reached after his termination was defamatory. Defendant argues that the alleged defamatory statements are protected by a qualified privilege because they were made with a legitimate business purpose and without malice.

▰▰▰ In order for a statement to be defamatory, it must be communicated to someone other than plaintiff, it must be false, and it must tend to harm plaintiff's reputation and to lower his estimation in the community. *Lee v. Metropolitan Airport Comm'n,* 428 N.W.2d 815, 819 (Minn. Ct.App.1988). Slanders affecting a person in his business, trade, profession, office or calling are slanderous per se and actionable without any proof of actual damages. *Id.* Certain statements made in a business setting may not be actionable, however, because of a qualified privilege. *Id.* For a communication to be privileged, it must be upon a proper occasion, from a proper motive, and must be based on reasonable or probable cause. *Id.* at 819–20 (citing *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256–57 (Minn.1980)). Actual malice must then be proved before there can be a recovery. In applying the privilege, the Minnesota Supreme Court has explained that "communications between

an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees." *McBride v. Sears Roebuck & Co.,* 306 Minn. 93, 235 N.W.2d 371, 374 (1975).

▰▰▰ Opinions, as opposed to facts, are absolutely protected under the first amendment and are not actionable in a defamation action. *Lee,* 428 N.W.2d at 820. In order to determine whether a statement is an opinion or a fact, Minnesota courts use a multifactor test. *Id.* The four factors to be considered are: (1) the precision and specificity of the disputed statement; (2) the statement's verifiability; (3) the literary and social context in which the statement was made; and (4) that statement's public context. *Id.* Ultimately, however, truth is a question for the jury. *Tsudek v. Target Stores, Inc.,* 414 N.W.2d 466, 469 (Minn.Ct.App.1987).

▰▰▰ The statements made by Riedman employees concerning their lack of knowledge about Heimbach's location are protected by the workplace privilege. The record before the Court is lacking in evidence to suggest that the employees exhibited any malice. Further, the employees had a legitimate business purpose in refraining from providing Heimbach's personal contact information to anyone calling the Riedman office. While the Riedman employees could certainly have been more accommodating to Heimbach in providing him with contact information for former clients attempting to reach him, the actions of the employees simply do not rise to the level of defamation.

▰▰▰ The same can be said of the statements made by Ball about Heimbach. The statements were made in the context

of an investigation by the company into Heimbach's job performance. While the Court has found that material fact questions exist on plaintiff's breach of contract, discrimination, and retaliation claims, the Court cannot conclude that Ball was making the statements without a legitimate business purpose. In addition, evidence of malice on the part of Ball in the record is sparse. Further, given the difficulty in actually verifying the statements and the context in which the statements were made, Ball's statements are more accurately characterized as opinions rather than facts. Accordingly, Riedman's motion for summary judgment on plaintiff's defamation claim is granted.

## V. Intentional Infliction of Emotional Distress

Heimbach's complaint also includes a claim for intentional infliction of emotional distress. Plaintiff alleges that Riedman knew that Heimbach suffered from a condition that was exacerbated by stress, yet intentionally pursued a course of action that increased Heimbach's stress. Defendant moves for summary judgment on this claim, arguing that Heimbach has failed to show any evidence that supports a claim for intentional infliction of emotional distress.

■ A claim for intentional infliction of emotional distress requires that Heimbach demonstrate Riedman's conduct was: (1) extreme and outrageous; (2) intentional and reckless; (3) that it caused emotional distress; and (4) was so severe that no reasonable person could be expected to endure it. *Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 439–40 (Minn.1983).

■ The standard for intentional infliction of emotional distress is a particularly high one, and in this case, Heimbach has failed to proffer evidence that supports such a claim. Heimbach has not shown that he suffered any physical symptoms resulting from the stress, other than those associated with his illness. Moreover, the distress suffered by Heimbach as a result of Riedman's conduct cannot be said to be any more severe than that experienced by other people who have been laid off from their jobs. *See Cafferty v. Garcia's of Scottsdale, Inc.,* 375 N.W.2d 850, 853 (Minn.Ct.App.1985) ("if the claimed distress is of the type that people commonly encounter and endure in their lives, then the claim should not even be submitted to the jury"); *Eklund v. Vincent Brass and Aluminum Co.,* 351 N.W.2d 371, 379 (Minn.Ct.App.1984) ("recognizing that Minnesota disfavors tort claims seeking damages for intentional infliction of emotional distress, and recognizing that [plaintiff's] experience is not dissimilar to that of many laid-off employees, we agree with the trial court that [plaintiff] did not meet the threshold required to go to the jury"), *overruled on other grounds, Hunt v. IBM Mid. Am. Employees Fed. Credit Union,* 384 N.W.2d 853, 858–59 (Minn.1986). The conduct in this case does not compare favorably with the conduct Minnesota courts have found to be "extreme and outrageous." Defendant's motion for summary judgment as to plaintiff's claim for intentional infliction of emotional distress is therefore granted.

## VI. Unjust Enrichment

Plaintiff's final claim is one for unjust enrichment. Heimbach asserts that he has presented sufficient evidence to permit a jury to conclude that Riedman terminated him under a pretext so that it could reap the benefits of his book of business without compensating him for it. Defendant argues that plaintiff was not damaged by its conduct because Heimbach is currently selling insurance to many of the customers he served while at Riedman's and he is currently receiving higher compensation.

To establish a claim for unjust enrichment, plaintiff must show that defendant knowingly received something of value, while not being entitled to the benefit, and under the circumstances, it would be unjust to permit its retention. *Southtown Plumbing, Inc., v. Har–Ned Lumber Co.,* 493 N.W.2d 137, 140 (Minn.Ct.App.1992). An action for unjust enrichment may be based on failure of consideration, fraud, mistake, and situations where it would be morally wrong for one party to enrich himself at the expense of the other party. *Anderson v. DeLisle,* 352 N.W.2d 794, 796 (Minn.Ct.App.1984). Normally, "an unjust enrichment claim 'does not lie merely because one party benefits from another's efforts and obligations', but rather it must be shown that a party was 'unjustly enriched in the sense that the term "unjustly" could mean illegally or unlawfully.' " *Schlegelmilch v. Schlegelmilch,* C1–00–951, 2001 WL 69998, *7 (Minn.Ct.App., Jan.23, 2001) (quoting *Custom Design Studio v. Chloe, Inc.,* 584 N.W.2d 430, 433 (Minn.Ct. App.1998)). "But this court has upheld awards for unjust enrichment in the absence of an express finding of fraudulent or illegal acts where there was wrongdoing similar in nature to fraud." *Id.* However, recent authority from the Minnesota Court of Appeals has explained that where the plaintiff has an adequate legal remedy, he **cannot** bring an equitable claim for unjust enrichment. *Excel Homes of Minnesota, Inc. v. Ivy Ridge Home Builders, Inc.,* C2–00–1686, 2001 WL 506782, at *3–*4 (Minn.Ct.App., May 15, 2001).

Based on this recent clarification of the law from the Minnesota Court of Appeals, the Court is constrained to grant summary judgment in favor of defendant on this claim as plaintiff has adequate legal remedies in this case.[10]

10. The Court notes its concern with the impli-

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Riedman Corporation's motion for summary judgment [Docket No. 36] is **GRANTED in part** and **DENIED in part.**

2. Defendant's motion is **GRANTED** as to plaintiff's claims on Counts III (Defamation), IV (Intentional Infliction of Emotional Distress), and V (Unjust Enrichment) of the Amended Complaint and these counts are **DISMISSED WITH PREJUDICE.**

3. Defendant's motion is **DENIED** as to Counts I (Breach of Contract), VI (Discrimination on the Basis of Disability), and VII (Retaliation) of the Amended Complaint.

cation of the *Excel Homes* case.