Mickey **GONZALEZ**, Plaintiff,

v.

State of **OHIO, DEPARTMENT OF TAXATION,** Defendant.

No. C2: 97 CV 00396.

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 23, 1998.

---

John Spenceley Marshall, Columbus, OH, for Mickey Gonzalez.

Anna M. Rouhana Seidensticker, Buckingham Doolittle & Burroughs, Columbus, OH, for State of Ohio Department of Taxation.

### *OPINION AND ORDER*

MARBLEY, District Judge.

#### I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment. Plaintiff Mickey Gonzalez alleges, *inter alia,* violation of his rights under 42 U.S.C. § 2000e–3(a). For the reasons set forth below in this Opinion, Defendant's Motion for Summary Judgment is hereby **GRANTED.**

#### II. FACTUAL BACKGROUND

Plaintiff began working at the Department of Taxation ("Department") on September 29, 1986 as an Appraiser in a division referred to as the Division of Tax Equalization ("DTE"), a position that he continues to hold. DTE is responsible, in part, for gathering data on sales of commercial, industrial, and agricultural properties throughout the state of Ohio.

Throughout Plaintiff's employment, Ronald Hohman has been the Administrator of DTE. From April, 1987 until October, 1996, David Stone was the Assistant Administrator of DTE.[1] From March, 1986 until October, 1996, Wallace Burkey was a Tax Commissioner Agent Supervisor and, since

---

1. In October 1996, Mr. Stone was promoted to Tax Program Administrator 1 in the Department's School District Income Tax Division.

1987, reported directly to Mr. Stone.[2] Under Mr. Burkey's direct supervision were the Appraisal Supervisors over the commercial-industrial appraisers and the agricultural appraisers, respectively. For most of Plaintiff's employment and for all periods relevant to this litigation, Dale Schuler was the Appraisal Supervisor over the agricultural appraisers, and Steven Shoup has been the Appraisal Supervisor over the commercial-industrial appraisers.

In order to accomplish the appraisals or sales verification of real property throughout Ohio, appraisers are assigned either to the commercial and industrial properties or to the agricultural properties in counties throughout Ohio. Throughout the majority of time relevant to Plaintiff's claim, DTE had commercial-industrial appraisers, whose responsibilities generally included appraising or verifying sales of various commercial and industrial properties; and agricultural appraisers, who had similar responsibilities in relation to agricultural properties. When Plaintiff began working at DTE in 1986, until approximately late 1989 or early 1990, the appraisers were responsible for appraising properties and preparing appraisal reports. In early 1990, Mr. Stone learned that the appraisal reports that the DTE appraisers generated relied on market factors which were not reliable. As a result, in Mr. Stone's estimation, the appraisal reports themselves were not reliable. Mr. Stone determined that the appraisers in DTE, including Plaintiff, could not be expected to know enough about the areas where the properties that were being appraised were located to generate accurate market factors and to make their resulting appraisal reports accurate and meaningful. As a result, Mr. Stone required the DTE appraisers to begin verifying sales of properties, a system of gathering values for the purpose of collecting data about properties that is not as complex as conducting actual appraisals, and is based upon more objective criteria. In sales verifications, appraisers generally verified the validity of property sales in counties throughout Ohio. In verifying a particular sale, the appraisers would: (1) interview the buyer and seller in order to determine whether or not an arms' length transaction occurred; (2) review records at the particular county's courthouse to determine descriptive information about the subject property; and (3) view the subject property.

When Plaintiff was first employed at the Department, he worked as an Appraiser I and he was assigned to appraise commercial and industrial properties. At some point during 1987, at Plaintiff's request, he was assigned to appraise agricultural properties, where he has remained.[3] Plaintiff was promoted to the Appraiser II position in June 1989.

For the period of time relevant to this litigation, the appraiser positions in DTE have required travel, including overnight travel. Because all of the appraisers in DTE review county records, meet with property buyers and sellers, and view the properties for which they are verifying sales, travel to the counties in question for varying lengths of time is and, for all time periods relevant to this litigation, has been required.

### A. The *Dibari* Matter

In April 1993, Plaintiff provided an affidavit to the Ohio Civil Rights Commission in relation to complaints initiated by another DTE appraiser, Donna Dibari (the *"Dibari* OCRC Litigation"). Subsequently, Ms. Dibari initiated litigation in this Court against the Department contending that she suffered sex discrimination and retaliation (the *"Dibari* Federal Litigation").[4] In June 1994, Plaintiff provided deposition testimony in relation to the *Dibari* Federal Litigation.

Plaintiff contends that, since he provided the affidavit in the *Dibari* OCRC Litigation,

---

**2.** In October 1996, Mr Burkey was transferred to the Department's School District Income Tax Division.

**3.** Plaintiff volunteered to be assigned to the agricultural side of DTE so that Donna Dibari, another appraiser having allergies that were exacer-

bated in rural settings, could take his place on the commercial-industrial side.

**4.** That case was captioned, *Donna Dibari v. State of Ohio*, Case No. C2–94–0063 (U.S. District Court for the Southern District of Ohio, Eastern Division).

he has suffered retaliation by his supervisors and others at the Department. Plaintiff also contends that this retaliation continued and increased after he was deposed in the *Dibari* Federal Litigation. In his Complaint, discovery responses, a deposition testimony, Plaintiff lists over 30 incidents of alleged retaliatory conduct by Defendant. For reasons which will be explained later in this Opinion, only the following four are pertinent to the matter presently before this Court. First, Plaintiff alleges that on two occasions, in July and August, 1995, Defendant's supervisors prominently displayed articles which were targeted at Plaintiff's participation in the *Dibari* matters—"Workplace Enemies: There's A Way to Deal With Ill–Witted, Conniving Colleagues" and "Chronic Workplace Complainers." Second, Plaintiff alleges that one of his supervisors told a Motor Fuel Tax Agent and others that Plaintiff was on "disability leave," thereby breaching Plaintiff's confidentiality. Plaintiff contends that such a breach is indicative of the offensive behavior to which he was subjected following his participation in the *Dibari* matters. Third, Plaintiff avers that on December 22, 1995, a supervisor told him an offensive joke regarding short men in Antarctica and their problems urinating in the cold. According to Plaintiff, on December 22, 1995, Mr. Burkey allegedly said to Robert Mockler and Plaintiff that "short men have a problem in the antarctic ... because they wear 6″ of clothing, they can't get their [motioning to his zipper area] thing out of their pants." Again, Plaintiff contends that such offensive behavior was in retaliation for his participation in the *Dibari* matter. Finally, Plaintiff contends that Defendant failed to promote him to the position of Appraiser III upon the retirement of Bill Rose.

**B. Plaintiff's Administrative Remedies**

On February 9, 1996, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") only alleging retaliation (EEOC Charge No. 220960403). Plaintiff received a Notice of Right to Sue and filed this lawsuit on April 8, 1997. Subsequently, Plaintiff filed another charge with the EEOC alleging both retaliation and disability discrimination based upon Title VII and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, (EEOC Charge No. 220971242). The sole factual allegation in the second charge is that the Department retaliated against Plaintiff and discriminated against him by failing to accommodate his alleged disability, bi-polar disorder. The EEOC has not issued a notice of right to sue in relation to the second charge.

### III. LEGAL ANALYSIS

#### A. Standard For Summary Judgment

Rule 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (Summary judgment appropriate where the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26

L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

### B. Timely Filing of Plaintiff's EEOC Complaint

Prior to filing a Title VII claim, a plaintiff must either file a timely charge of employment discrimination with the EEOC, or receive and act upon the EEOC's statutory notice of the right to sue. 42 U.S.C. § 2000e–5(e)–(f). Charges of discrimination under Title VII must be filed within 180 days of the occurrence of the alleged discriminatory act. 42 U.S.C. § 2000e–5(e). This 180–day time period has been enlarged for so-called "deferral" states—where proceedings have been filed first with a state or local agency, a complainant may file a claim with the EEOC within 300 days of the alleged discriminatory act, or within 30 days of the termination of state or local proceedings, whichever is earlier. 42 U.S.C. § 2000e–4(e). Ohio is a deferral state for the purposes of Title VII, and the Ohio Civil Rights Commission ("OCRC") is the designated deferral agency. 29 C.F.R. § 1601.80.

■ There is an exception to the limitation period for filing a claim with the EEOC. Where a party demonstrates that subsequent identifiable acts of discrimination occurred within the critical time period—either the 180–day period or the 300–day referral period—the applicable time period is tolled, and begins to run anew from the date of the last asserted occurrence of that practice. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Hull v. Cuyahoga Valley Bd. of Ed.,* 926 F.2d 505, 510 (6th Cir.1991).

As a threshold matter, the Court notes that the 300–day exception only comes into play if Plaintiff filed an action with a state administrative agency—in Ohio, the OCRC. Plaintiff did not file an action with OCRC. Thus, the relevant time period for the case at bar is the 180 days prior to February 9, 1996.

Put another way, this Court must determine whether Plaintiff has demonstrated that identifiable acts of retaliation occurred after August 11, 1995. If not, then all claims related to conduct which occurred prior to August 11, 1995, are time barred under § 2000e–5(e).

Only two of Plaintiff's alleged thirty-plus incidents of retaliation occurred within the 180–day time period preceding Plaintiff's filing of his EEOC complaint. The Court must therefore turn its attention to those acts to determine whether either, or both constitute identifiable acts of retaliation against Plaintiff for his participation in the *Dibari* matters.

#### 1. The July, 1995, and August, 1995, Posting of Articles

■ First, Plaintiff's allegation regarding the posting of articles in July, 1995, falls outside of the 180–day time period preceding his filing of an EEOC complaint. As such, all that remains for consideration by this Court is Plaintiff's allegation regarding the August, 1995, article posting.

Plaintiff does not provide an exact date of the August article posting. Such an omission, however, is of no moment because, even assuming *arguendo* that the August article was posted after August 11, 1995, the Court finds that Plaintiff has not met his burden of establishing that the posting of the article was causally connected to his participation in the *Dibari* matters. First, the Court finds that the causal connection between the article posting and Plaintiff's participation in the *Dibari* matters is attenuated by the fact that a significant amount of time—over a year—passed between Plaintiff's last participation in the *Dibari* matters—the June, 1994, deposition in the Federal Litigation—and the article posting—August, 1995. Temporal relationship between a plaintiff's participation in protected activities and a defendant's alleged retaliatory conduct is an important factor in establishing a causal connection. *See, e.g., Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272, 1273 (6th Cir.1986) (in absence of other evidence showing a causal link between the filing of plaintiff's discrimination complaint and her discharge, "the mere fact that [plaintiff] was discharged four months after

filing [the] discrimination claim is insufficient to support an inference of retaliation"); *Hill v. Judson Retirement Community*, 775 F.Supp. 1090, 1096 (N.D.Ohio 1991) (two month time period insufficient); *Wheelwright v. Clairol, Inc.*, 770 F.Supp. 396, 401 (S.D.Ohio 1991) (four week time period insufficient); *Brown v. ASD Computing Ctr.*, 519 F.Supp. 1096, 1116 (S.D.Ohio 1981) (holding that, in absence of proof of retaliatory motive, fact that employee was terminated three months after announcing intent to file discrimination claim was insufficient to support inference of retaliation), *aff'd. sub nom, Brown v. Mark*, 709 F.2d 1499 (6th Cir.1983). Second, Plaintiff testified in his deposition that he "assumed" that the articles were directed toward him. Plaintiff adduces no evidence which indicates that others in his department perceived the article posting as some type of retaliatory conduct toward him or a message that his participation in the *Dibari* matter was inappropriate in any way. Thus, the Court finds that the August, 1995, article posting does not constitute an identifiable act of retaliation which tolls the 180–day time period for filing an administrative claim.

### 2. Offensive Joke

■ Next, the Court addresses Plaintiff's claim that the "short man" joke told to him on December 22, 1995, constitutes an identifiable act of retaliation. The Court again finds that this incident bears no rational causal relationship to the *Dibari* matter. Plaintiff alleges that the joke was offensive to him because of the subject matter—presumably that the central character in the joke was disabled by virtue of his lack of height—and, thus, demonstrates the offensive conduct to which he was subjected following the *Dibari* matter. However, Plaintiff cannot support his allegation that he was subjected to the joke as a retaliatory act with anything more than his own bald assertions regarding the atmosphere of the office, and conjecture and speculation regarding the joke-teller's intention. Furthermore, like the August, 1995, article posting, this act is not related temporally to the *Dibari* litigation in such a way to demonstrate a causal connection between the two. Thus, the Court finds that this act is not an identifiable act of retaliation sufficient to warrant tolling the 180–day period.

Based on the foregoing, the Court finds that the Plaintiff did not timely file his EEOC claim.

### C. Adverse Employment Action

■ Even assuming that Plaintiff filed a timely complaint with the EEOC, the Court finds that the Plaintiff has failed to establish a *prima facie* case of retaliation under § 2000e–3(a). To establish a *prima facie* case of retaliation under Title VII, a Plaintiff must demonstrate:

(1) He engaged in an activity protected by Title VII, or opposed a practice made unlawful by Title VII;

(2) The Defendant was aware of such activity;

(3) The Defendant subsequently took adverse employment action against the Plaintiff; and

(4) There exists a causal connection between the protected activity and the adverse employment action.

*Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (6th Cir.1990), *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).

[5] In the present matter, it is undisputed that Plaintiff engaged in a protected activity under Title VII during the *Dibari* matter. It is also undisputed that as of April, 1993, and December, 1994, Defendant was aware of Plaintiff's activity in the *Dibari* matter. The only issues before the Court with respect to the *prima facie* case, then, are whether Plaintiff has adduced sufficient evidence to demonstrate that he suffered an adverse employment action, and whether there is a causal connection between the adverse employment action and the protected activity in which Plaintiff engaged.

As a threshold consideration, the Court notes that Plaintiff has not alleged that his employment was terminated, that he suffered a demotion, decrease in wages, material loss of benefits, nor that he was given a less distinguished title. In fact, of the thirty-plus incidents cited by Plaintiff as evidence of retaliatory conduct, only one rises to the

level of a putative adverse employment action. Plaintiff alleges that Defendant failed to promote him to the position of Appraiser III following the retirement of Bill Rose, an agricultural appraiser. Plaintiff offers no evidence, however, which contradicts Defendant's contention that it chose not to post or fill Rose's position due to the reduced job responsibilities of the appraisers—appraisers were limited to performing sale verifications only, not actual appraisals. With reduced job responsibilities, it is undisputed that there was no longer a need for the Appraiser III position. Furthermore, Plaintiff has presented no evidence which would demonstrate that Defendant's decision to eliminate the Appraiser III position held by Rose was motivated by animus toward Plaintiff's participation in the *Dibari* matters.

The cases cited by Plaintiff in support of his contention that he suffered an adverse employment action even though he was not terminated, disciplined, or demoted, are inapposite. First, while it is true that the Sixth Circuit in *Harrison v. Metropolitan Govt. of Nashville and Davidson Cty., Tenn., et al.,* 80 F.3d 1107 (6th Cir.1996), did note that retaliation can be found in situations where a party is not terminated, disciplined, or demoted—for example, where a party demonstrates that he or she was scrutinized more carefully than other employees—the plaintiff in *Harrison* was suspended following the filing of an EEOC charge. In the present matter, Plaintiff has not been suspended, otherwise disciplined, or more closely scrutinized that other employees, since his participation in the *Dibari* matters. Similarly, unlike Plaintiff in the case *sub judice,* the Plaintiff in *Davis v. Fleming Cos., Inc.,* 55 F.3d 1369 (8th Cir.1995), was terminated. Finally, in *Jordan v. Wilson,* 851 F.2d 1290 (11th Cir.1988), the Court held that increased scrutiny and criticism of job performance following protected activity can constitute retaliatory conduct, but only where a plaintiff demonstrates that such increased scrutiny and criticism resulted in some type of *tangible* job detriment to the plaintiff's work performance or environment. Here, Plaintiff has failed to adduce any evidence which would demonstrate a tangible job detriment

as a result of his participation in the *Dibari* matters.

Based on the evidence in the record, the Court finds that Plaintiff has failed to demonstrate the he suffered an adverse employment action. Thus, the Court finds that, even if Plaintiff's EEOC charge had been filed in a timely manner, Plaintiff has failed to establish a *prima facie* case of retaliation under Title VII.

### IV. CONCLUSION

Based on the foregoing, this Court hereby **GRANTS** Defendant's Motion for Summary Judgment. Judgment is rendered for Defendant on Plaintiff's claim under 42 U.S.C. § 2000e–3(a), the only claim in this case.

**IT IS SO ORDERED.**

**Meg DHAMER, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**BRISTOL–MYERS SQUIBB COMPANY and Cephallon Laboratories, Defendants.**

No. 98 C 2243.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 18, 1998.

Ronald S. Goldser, Zimmerman and Reed, Minneapolis, MN, James W. Johnson, Goodkind, Labaton, Rudoff & Sucharow, New York City, Aron D. Robinson, Chicago, IL, Robert J. Sheppard, Sheppard, Weisberg & Miller, San Francisco, CA, for Plaintiff.

Julian Solotorovsky, Peter E. Carlson, Kelley, Drye & Warren, Jeffrey Singer, Jennifer K. Fardy, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, IL, John F. Brenner, McCarter & English, Newark, NJ, for Defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This is a putative class action brought by named plaintiff Meg Dhamer ("plaintiff" or "Dhamer") against defendant Bristol–Myers Squibb Co. ("defendant" or "BMS") seeking damages and injunctive relief.[1] Plaintiff's five count complaint alleges that a prescription pain relief product, Stadol Nasal Spray ("Stadol NS"), sold by defendant was dangerous, defective, addictive and did not bear adequate warnings. Count I alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, count II alleges violations of the New Jersey Consumer Fraud Act, count III alleges breach of implied warranties of merchantability and fitness for a particular purpose, count IV alleges negligence and negligent misrepresentation, and count V seeks medical monitoring.[2] Plaintiff's motion only seeks certification of a class for Counts I, II, and V of the complaint.

Pursuant to Rules 23(b)(3) or 23(b)(2) of the Federal Rules of Civil Procedure, plaintiff seeks to certify a class of "all United States residents who purchased and used Stadol [NS]," (the "Medical Monitoring Class"). On behalf of the proposed class,

---

**1.** Plaintiff has also sued Cephalon, Inc. but does not seek to certify a class with respect to Cephalon.

**2.** A claim for medical monitoring lies when a plaintiff seeks compensation for a toxic exposure that has not yet produced any physical manifestation of injury or disease. Although the viability of a cause of action for medical monitoring has not yet been addressed in many jurisdictions, courts that have recognized the claim have concluded that a plaintiff may recover the cost of diagnostic medical evaluation proved to be proximately caused by the defendant's wrongdoing. *See, e.g., In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 852 (3d Cir.1990); *see also Carey v. Kerr–McGee Chem. Corp.,* 999 F.Supp. 1109 (N.D.Ill.1998).

plaintiff seeks to establish a court supervised medical monitoring program to identify those Stadol NS users who have become addicted to the drug and to pay for medical expenses related to treatment of addiction. In addition, plaintiff also seeks certification of a subclass of the Medical Monitoring Class including "all Stadol NS users who became addicted to the drug." On behalf of this subclass, (the "Consumer Fraud Subclass"), plaintiff seeks to recover money that subclass members spent on Stadol NS pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–2 *et seq.* and/or the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1.

Plaintiff contends that all prerequisites for class certification have been met and that certification is proper under Rule 23(b)(3) or 23(b)(2). Defendant argues that individual issues predominate precluding certification of the class and that a nationwide class is not a superior method for adjudicating the dispute.[3]

## I. BACKGROUND

According to the allegations of the complaint, the facts are as follows. Defendant supplies butorphanol tartrate under the brand name "Stadol NS." Butorphanol tartrate possesses narcotic properties and was originally used by physicians in hospitals to treat post-operative pain and administered to the patient by injection. The Food and Drug Administration ("FDA") granted BMS ap-

proval to sell Stadol in a more readily accessible form as a nasal spray.

After receiving FDA approval, BMS marketed Stadol NS to individuals who suffered from migraine headaches and other chronic pain. Plaintiff alleges that BMS represented to the FDA that Stadol NS had few of the addictive qualities of other narcotics and would be used in a manner consistent with its prior use as temporary pain relief and would not be for prolonged or repetitive use. Plaintiff alleges that BMS marketed Stadol NS to individuals plagued with chronic pain in a manner inconsistent with its representations to the FDA.

tients and to those with a history of drug misuse. When long-term therapy is necessary, such patients should be closely supervised."
—"Because of its opioid antagoist properties, butorphanol is not recommended for use in patients dependent on narcotics."