**Genevieve FAIR, Plaintiff,**

v.

**ARKANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, Defendant.**

**No. LR–C–99–042.**

United States District Court, E.D. Arkansas, Western Division.

Aug. 25, 2000.

Sheila F. Campbell, Little Rock, AR, for Plaintiff.

Mark Pryor, Arkansas Attorney General by Wendy K. Michaelis, Arkansas Attorney General's Office, Little Rock, AR, for Defendant.

## MEMORANDUM OPINION AND ORDER

HOWARD, District Judge.

Currently pending before the Court is Arkansas Public Employees Retirement System's renewed motion for summary judgment to Genevieve Fair's amended complaint alleging that she was denied a position of Investment Supervisor on July 10, 1998, and further denied a position of Investment Specialist in November, 1998, which action, she argues, was intentional discrimination because of her race, African-American. Given the fact this Court

is persuaded that intent, motive and credibility are key factors that must be dealt with in resolving the issues in this proceeding as well as the use of subjective criteria in Arkansas Public Employees Retirement System's promotion procedure, the Court denies Arkansas Public Employees Retirement System's motion for summary judgment. The Court is convinced that Genevieve Fair's claims raise genuine issues of material fact for the reasons discussed hereinafter.[1]

## I.

## BACKGROUND

Genevieve Fair (plaintiff), an African-American female, is a high school graduate; she received an Associate Degree in Business Administration from Capital City Business College of Little Rock, Arkansas, and has accumulated fifty-six hours of credits towards an accounting degree at the University of Arkansas at Little Rock.

Plaintiff was employed by Arkansas Public Employees Retirement System (APERS) in November, 1984 as a Bookkeeper II, Grade 11. Plaintiff's duties included creating, posting and processing journal vouchers on a daily basis as well as depositing and transferring funds from various accounts. Before joining APERS, plaintiff was employed by Thiokol Chemical as a bookkeeper. In 1976, plaintiff was employed by Super X Drugs as a cashier and bookkeeper.

On October 2, 1987, plaintiff filed a lawsuit against APERS alleging that she had been denied several promotions because of her race. The case did not proceed to

---

1. Plaintiff made the Board of Trustees, Quida Wright, Larry Fratesi, Jimmie Lou Fisher, Gus Wingfield, Edwin W. Waddell, Richard Weiss, Williams A. Baker, Don Zimmerman and Jonathan R. Sweeney, as well as Van Cleve, Director, defendants in their individual and official capacities in her amended complaint. Arkansas Public Employees Retirement System argues that it is the appropriate defendant in this proceeding and this action should be dismissed as to the members of the

Board of Trustees and the Director. After carefully reviewing the record, the Court is persuaded that the Board of Trustees and the Executive Director are not employers within the meaning of Title VII and, accordingly, this action is dismissed as to the Board of Trustees and the Director in their individual and official capacities. See *Spencer v. Ripley County State Bank,* 123 F.3d 690 (8th Cir.1997) (stating that a supervisor does not qualify as an employer for purposes of Title VII).

trial, but was settled by the parties. In her deposition, in the current proceeding, plaintiff stated that, pursuant to the settlement, she was promoted from a grade eleven to a grade seventeen; that she was advised by the attorneys for APERS that the settlement arrangement would "... put me in line for future promotions which has not happened[;]" and that she is currently a grade eighteen. However, plaintiff admitted, in response to a question posed by current counsel for APERS, that the alleged comment of counsel for APERS during the settlement negotiation is not set forth in the written document setting forth the terms of the settlement, but stated that she considered the statement to be part of the settlement.

The settlement agreement is dated April 14, 1989. The agreement reveals that plaintiff claimed that APERS unlawfully denied her several promotions because of race or sex and unlawfully retaliated against her for filing the complaint; and that the minimum educative qualifications established for the positions sought, while neutral on their face, have a negative impact on blacks. The agreement further provides that plaintiff would be promoted to Accountant II position and plaintiff "will follow the job specification established by OPM .... [And] 'perform other duties as assigned' [which] will include, but is not limited to, overseeing the receipt and posting of all monthly employer and employee contributions (includes the issuance of penalties for late reports and late moneys), overseeing the monthly distribution of employer reporting pre-lists and instructions, overseeing the issuance of credits/debits to employers that have over/underpaid, and overseeing the resolution of 7130 Reconciliation Report out-of-balance situations that are related to employer reports."

The agreement further provides that "[t]he parties agree that Fair shall be eligible to receive consideration for a step increase on her employment anniversary date. As with all employees, any step increase shall be based on merit."

In addition, the settlement agreement notes that "Fair specifically releases and discharges defendants from any and all claims regarding her application for and failure to receive the following promotions at APERS: Management Project Analyst (application in autumn, 1985); Agency Fiscal Supervisor (December, 1985); Accounting Supervisor II (December, 1985); Accounting Supervisor I (February, 1986); Accountant I (May, 1986); Reporting Specialist III (July, 1986); Investment Specialist (March or April, 1988); Retirant Specialist I (April, 1988); Retirant Specialist I (later in 1988)." (See Defendant's Exhibit 1).

On July 18, 1998, plaintiff applied for an Investment Supervisor position, but was not selected. A white female, Mary Bridges, was selected to fill the position. In November, 1998, plaintiff was not selected to fill an Investment Specialist position. However, Patricia Clark—according to an affidavit of Rebecca L. Walker, the personnel officer and the Manager of Administrative Services for APERS, Patricia Clark is a black female, *but Patricia Clark listed herself as an "American Indian or Alaskan Native" in her application for the position,* this, of course, raises credibility and motive questions—and Regina French, a white female, were hired.

On January 15, 1999, plaintiff instituted this action contending that APERS' refusal to promote plaintiff to the Investment Supervisor position as well as the Investment Specialist position was due to her race; and, consequently, APERS' action constituted a violation Title 42 United States Code Sections 1981 and Title 42 United States Code Section 2000e.

APERS denies that plaintiff's race was a factor in the decision not to promote plaintiff to either the Investment Supervisory position or the Investment Specialist position; that while plaintiff possessed the minimum qualifications for the two positions, she was not recommended by APERS' Qualifications Review Committee

because the committee decided that plaintiff did not possess the knowledge, skills and abilities to perform either job; and that the selectees were better qualified.[2]

Plaintiff also admitted that she did not apply for three advertised Investment Specialist openings during the early part of 1998, but gave the following reason for not applying: " ... I had always been told that there—that degree was required for certain positions and I discovered that it was not, then I decided it was time for me to try to move up." [3]

II.

DISCUSSION

A. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment if it is evident "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party, initially, has the burden of informing the court of the basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-moving party shall file "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). See also: Local Rule 56.1 of this Court. The non-moving party must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538. In essence, "[t]o withstand a motion for summary judgment, a party need not prove in its favor an issue of material fact. All that is required ... is sufficient evidence supporting a material factual dispute that would require resolution by a trier of fact." *Hase v. Missouri Division Of Employment Security* 972 F.2d 893, 895 (8th Cir. 1992). The test for determining whether a genuine issue of material fact exists is the

2. Defendant's exhibit 3 designates the following as qualifications for Investment Supervisor's position:

Minimum Qualifications: The formal education equivalent of a bachelor's degree in accounting, finance, finance and banking, or a related field; plus three years' progressively more responsible experience in investing or a related field. Finance & Banking.
Other job related education and/or experience may be substituted for all or part of these basic requirements upon approval of the Qualifications Review Committee.
*KNOWLEDGES, ABILITIES, AND SKILLS*
Knowledge of the principles and practices of accounting.
Knowledge of investment principles and practices.
Knowledge of the operation of personal computers and the functions of the software used.
Ability to analyze financial data, project outcomes, and recommend future actions.
Ability to plan, organize, and coordinate the work of subordinates.
Ability to interpret and apply the provisions of laws, rules, or regulations to specific situations.
Ability to maintain detailed records and prepare and present oral and written reports.

3. Defendant's exhibit 2 set forth the following as qualification for Investment Specialist's position:

Minimum Qualifications: The formal education equivalent of a bachelor's degree in accounting, finance, business administration, or a related field; plus, two years' experience involving the management, monitoring, and/or maintenance of records on securities investments.
Other job related education and/or experience may be substituted for all or part of these basic requirements upon approval of the Qualifications Review Committee.
*KNOWLEDGES, ABILITIES, AND SKILLS*
Knowledge of the principles and practices of accounting.
Knowledge of investment principles and practices.
Knowledge of the operation of personal computers and relevant applications systems.
Ability to maintain computerized and manual accounting records.
Ability to interpret and apply laws, regulations, or policies to specific situations.
Ability to identify and resolve discrepancies in financial reports.
Ability to compile and analyze data and prepare reports.

same as the test for granting a directed verdict or judgment as a matter of law; and in applying the test, the court must view the evidence in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby,* supra.

It is commonly recognized that where motive, intent and credibility are central factors in employment discrimination cases, summary judgment is generally inappropriate. See: *Davis v. Fleming Companies, Inc.,* 55 F.3d 1369, 1371 (8th Cir. 1995), where the Court made the following observation:

> Courts have recognized the difficulty in disposing of issues of discriminatory or retaliatory intent at the summary judgment stage. "Summary judgments should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion. All the evidence must point one way and be susceptible of no reasonable inferences sustaining the position of the nonmoving party."

### B. Title VII

This action is an individual private suit essentially under Title VII which prohibits intentional discrimination as well as practices that are neutral in form but discriminatory in effect. The Court is persuaded, after cautiously reviewing the record, that the facts and circumstances asserted by plaintiff indicate that the substance of plaintiff's claim is disparate treatment while disparate impact is implicated. Accordingly, in resolving the issue raised by APERS' motion for summary judgment, the Court will focus on the disparate treatment claim.

As articulated by the Eighth Circuit Court of Appeal in *Floyd v. State of Missouri Department of Social, Services, Division Of Family Services,* 188 F.3d 932, 935 (8th Cir.1999), initially, plaintiff must establish a prima facie case of discrimination. The burden then shifts to APERS "to articulate some legitimate, nondiscriminatory reason for the employee's rejec-

tion." If APERS satisfies its burden of production, plaintiff must show that the proffered reason is pretextual. However, plaintiff at all times retains the ultimate burden of persuading the fact finder.

The Court will now examine each of the steps in the burden shifting division in order to determine if plaintiff has established a viable cause of action.

■ Under the framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), see also *Lidge–Myrtil v. Deere & Company,* 49 F.3d 1308 (8th Cir.1995), plaintiff must demonstrate a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for the positions; (3) she was subjected to an adverse employment decision; and (4) either the positions remained open or was filled by someone not a member of her protected class. See *Roxas v. Presentation College,* 90 F.3d 310, 315 (8th Cir.1996) (observing that Title VII analysis is applicable to Section 1981 claims). See also: *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1308 (8th Cir. 1994) (a plaintiff is not required to demonstrate replacement by a person outside any protected class in order to establish a prima facie case). The Court is persuaded that plaintiff has established a prima facie case of race discrimination: As an African–American, she is a member of a protected class; she has applied and APERS has observed, in essence, that plaintiff met the minimum qualifications for the positions sought; and she was rejected and the two positions applied for were filled by white females and a third position by an alleged black female. As noted earlier, there is evidence in the record indicating that the third selectee is not African–American.

In response to plaintiff's prima facie case, APERS asserts that its interviewing and selection procedure is race-neutral; and that plaintiff was not selected for the Investment Supervisory position and the

Investment Specialist position because the selectees were better qualified which decision was made by a three member interviewing committee that rated the applicants relative to skills, knowledge and ability and recommended to the Director of APERS the individuals to fill the positions. The Director followed the committee's recommendations.

Inasmuch as APERS has asserted non-discriminatory reasons for its employment decisions in rejecting plaintiff to fill vacancies in the Investment Division, plaintiff has the burden to present evidence demonstrating that the asserted reasons by APERS are pretextual to cover discrimination. Stated differently, plaintiff must show that there is a genuine factual issue as to discriminating intent.

In response, plaintiff, in essence, argues that her rejection for the positions she applied for occurred under circumstances that give rise to an inference of discriminatory intent and motive, thus generating a genuine question of fact relative to plaintiff's qualification for the positions sought.

First, plaintiff directs attention to APERS,' allegedly, wholly subjective criterion in evaluating applicants which practice leaves room for or causes disparate treatment on the part of an all white three member Qualifications Review Committee that is vested with the power to rank applicants without the benefit of any guidelines that would promote objectivity, fairness and evenhandedness; that the committee recommends to the Director of APERS the applicant to be promoted or hired; and the Director typically accepts the recommendation without interviewing the candidate.

Second, the following colloquy took place during the depositions of Gail Stone and Susan Bower who were members of the Qualifications Review Committee that recommended that plaintiff not receive promotion to the two positions sought:

A. Actually, I initially did not think that she qualified. That's my first blush, because I know what is needed as far as experience to adequately fulfill the job requirements. However, our personnel person actively insisted that Ms. Fair had an accounting background and had been in fact with the agency for fourteen years. Upon consideration I thought, well, yes, it's there in black and white, in print, that's exactly right. She's been with the agency for fourteen years. *Maybe she knows more than I think she knows.*

.... (Emphasis added).

Q. And how did you determine that [plaintiff] did a fine job at the position that she [holds] as an accountant?

A. In general conversations in my capacity as Assistant Director in talking with her manager, her manager has made comments that she's very happy with Ginny's job.

Q. So when you interviewed Ms. Fair for this job as Retirement Fund Investment Supervisor you were an Assistant Director at that time?

A. That is correct.

Q. And in that capacity you had talked with Ms. Fair' supervisor about the—

A. No. The two were not related. You talk about people, just how is the agency doing, blah, blah, blah. I happened to have that as a fact in my head.

Q. And would be fair say, Ms. Stone, that individual who has never worked with investments on a day-to-day basis would not be considered in the selection process for an Investment Supervisor?

A. Absolutely.

. . . .

Q.... And so unless she had some specific knowledge and/or experience in this particular she would not make the minimum cutoff for a selection for Investment Supervisor?

A. That was determined upon the interview. That is correct.

Q.... And her previous experience in the supervisory capacity—

A. I'm not aware that Ginny has been a supervisor.

Q. Okay. So is it fair to say that based upon assessment of her you did not consider that she had an experience in the realm of supervision?

A. That is correct. (Stone Tr. At 12–15).

. . . .

Q. In interviewing Ms. Fair and assessing whether she was qualified to work as an Investment Specialist, did you go back and look at the body of work that she's performed as an accountant in the administrative services department to determine whether those particular job duties and skills that she acquired there would equate to the knowledge and abilities and skills that you were looking for in your division?

A. Over her job duties?

Q. Yes.

A. No.

Q. And in evaluating a candidate for a position, is that an important factor to look at the body of work that they have performed in the past to determine if they have acquired the skills and abilities and knowledge that you are particularly looking for in your department?

A. In looking at their past experience and their qualifications and getting the most qualified person is what we do.

Q. Do you know whether in her current position she has any communications with banks?

A. I am not familiar with her job duties in her current position. (Bowers Tr. at 32–39).

. . . .

Q. . . . . [D]id you look at the different accounting courses that [plaintiff] took at UALR?

A. No, I did not.

Q. Do you know the content of the accounting courses that [plaintiff] took at UALR?

A. No.

Q. Do you know whether the accounting courses at UALR would have contained information regarding buying and selling of securities?

A. No.

Q. Do you know whether the accounting courses that Ms. Fair took at UALR would have instructed her in how to determine rations for the returns on investments?

A. No. (Bowers Tr. at 22–23).

. . . .

A. I don't know anything about her current job.

Q. Did you inquire with any of her current managers or supervisors whether her job requires her to interpret any laws, regulations or policies to specific situations?

A. No. (Bowers Tr. at 50).

. . . .

Q. Is there any record in the case of Ms. Fair of whether any of her job experience and/or her degree in accounting was substituted for any specific lack of experience that she may have in the investment section?

A. I don't have anything. (Bowers Tr. at 63).

Mary Bridges, the white female applicant who was selected to fill the Investment Supervisor's position, stated in her resume' that she had maintained investment portfolios in a former bank position. The following exchange took place between plaintiff's attorney and Gail Stone regarding Mary Bridges' skills and abilities as well as Stone's subjective determination based on personal contact and close acquaintance:

Q. Did you supervise Mary Bridges?

A. Yes, I did.

Q. How long did you supervise her?

A. Until—she was under my direct supervision until I made Assistant Director, so that would have been eight years.

Q. So you were her—you were the Investment Supervisor over her for eight years?

A. Uh-huh. There was an Investment Supervisor between us but I was hands-on manager. I was very much involved in the day-to-day activities of the entire staff.

Q. When it says she maintained investment portfolios, what do you understand that to mean?

A. *I would presume that meant that she maintained the proper level* of U.S. Treasury investments. That the short term funds and Cds, repo, banker's acceptances, commercial papers, were adequately and timely invested.

.... (Emphasis added).

Q. And on her resume' it indicated that she had a position of a portfolio administration accountant.

A. Uh-huh.

Q. Do you know what that position entailed?

A. *I would presume that would include very much the same kind of activities that an Investment Specialist does at our retirement system.* (Stone Tr. at 25–26).

(Emphasis added).

Gail Stone further testified as follows in her deposition:

Q. Have you ever hired an African-American in the investments department?

A. I personally did not, although subsequent to my promotion, Patricia Clark has come on board. (As previously noted Patricia Clark did not designate herself as African-American in her application.)

Q. During the time of the hiring of these one, two, three, four, five people, did you ever interview any African-Americans that had experience working for brokerage companies?

A. Absolutely.

Q. And do you recall any of those applicants?

A. No, not by name.

Q. Did you ever make a selection of any of those African–American applicants and they not take the position?

A. I don't recall. (Stone Tr. at 18–19).

Plaintiff gave the following responses to questions posed by APERS' attorney during her deposition:

Q. You stated in your discovery responses that there were no blacks hired to work with the investment department?

A. Prior to the EEOC charge being filed that's correct.

Q. Okay. But you are aware that Pasty Carter worked in investments as a secretary?

A. As a secretary.

Q. And she is black?

A. She is black.

Q. Okay. And Patricia Clark works in investments?

A. After the EEOC charge was filed.

Q. And Tunsia [phon.] Jones works in investments?

A. After the EEOC charge was filed. (Fair Tr. at 10–11).

. . . .

Q. You said that Betty Lovett would testify of adverse treatment against minorities. What gave you that idea?

A. Well, things that she had said.

Q. What?

A. She said that they [Gail Stone and Susan Bowers] were racist.

Q. To who?

A. She said that to me.

Q. Were you present for deposition?

A. No, I was not.[4]

. . . .

---

4. On October 8, 1999, Betty Lovett signed a declaration stating, among other things, that "I have never told Ms. Fair, or anyone else that I believed Gail Stone or Susan Bowers were racist."

Q. Theresa Thomas, you listed her and said she would testify that she had witnessed adverse statements by management regarding the plaintiff's promotion. Have you discussed that with Ms. Thomas?

A. She discussed it with me.

Q. Okay. Who made adverse statements regarding your promotion?

A. Well, one of the things that I remember her telling me was that Kie [Hall] use to tell her all of the time you're a friend to that Genny Fair who filed a lawsuit against me, you know.

Q. Was that true?

A. She told me that. He never said it to me but he said it to her, so I assume it's true, yes.

Q. And Theresa Thomas was your friend?

A. Yes, I think so.

Q. And you did file a lawsuit against Kie Hall?

A. I filed a lawsuit against the agency, yes. (Fair Tr. at 29–30).

Finally, plaintiff points to two conflicting affidavits given by Carol Roy, currently serving as a Management Project Analyst I for APERS and previously served as the Investment Supervisor, as additional evidence demonstrating that credibility is a central issue in this action and that there is a genuine issue of material fact relative to plaintiff's qualification for the positions she sought.

On October 5, 1999, Roy executed an affidavit stating, among other things, the following:

5. Gale Stone gave the following response to a question posed by plaintiff's attorney:
Q. During the time that you've been Investment Supervisor or Associate Director you were aware that there were no African-American Investment Specialists, correct?
A. Certainly. (Stone Tr. at 19).

6. Plaintiff gave the following response to questions posed by APERS' attorney:
Q. You stated in response to number nine that Kie Hall said he would not appoint a black in investments.

I, Carol Roy, did interview Genevieve Fair in 1988 for the position of investment specialist.... It was my opinion that Genevieve Fair has the knowledge and ability to perform the position of investment specialist. It was my opinion that Genevieve Fair was the best qualified applicant in 1988 to be an investment specialist. I selected Genevieve Fair for a position of investment specialist in 1988. The Director of the Arkansas Public Retirement System, Kie Hall, would not allow me to offer the position of investment specialist to Genevieve Fair.[5] (Roy's initial affidavit).

On the October 8, 1999, Roy executed an amended affidavit stating, in part, the following:

The affidavit I signed 10/6/99 had ... incorrect information.... For example, I stated that I previously selected Genevieve Fair for the position of investment specialist, and I discussed the knowledge, and skills needed for that job. However, I was incorrect. I previously selected Genevieve Fair in 1986 for the position of Accountant I, grade 15 in Investments....

. . . .

After I interviewed Ms Fair and others. Kie Hall refused to promote either of the finalist which were Ms. Fair and June Brussell, a white female who also worked for the agency at the time.... Mr. Hall never stated he would not hire a black in investments[6] .... (Roy's amended affidavit).

A. Yes.
Q. Who did he say that to?
A. It's my understanding, well, Carol Roy....
Q. What exactly did she tell you?
A. That I was the choice for this position, and she had given that information to the Attorney General's Office showing that I had been selected for that entry level position into Investments Department. And Kie Hall told her that I would not be given that position. (Fair Tr. at 26).

APERS argues that a comparison of ratings and qualifications of plaintiff and selectees demonstrate that the selectees were better qualified to fill the positions sought by plaintiff. After carefully reviewing the testimony of the committee members relative to the weight and consideration given to the interviews of the candidates as well as the candidates' responses to the questionnaires, the Court is of the view that it appears that the committee applied a more liberal and flexible interpretation or analysis to the selectees' responses as opposed to a strict and inflexible analysis to plaintiff's responses. For example, in several instances, Gail Stone who interviewed Mary Bridges, the white female selectee for the Investment Supervisor's position, "presumed" Bridges' responses encompassed investment activities that would qualify Bridges for the position. On the other hand, in considering plaintiff's responses, a rigid or strict construction was employed. Gail Stone, without the benefit of any information or records, initially held a negative attitude regarding plaintiff's ability to meet the minimum qualifications in order to be simply interviewed for the position sought by conceding "[m]ay be she knows more than I think she knows." (Stone Tr. at 12–15 and 25–26).

In addition, it appears from the testimony given by plaintiff that plaintiff was not fully counseled by the committee regarding the overall objective of the questionnaire or the variety of experience and information acceptable in determining plaintiff's skills, abilities and knowledge for the Investment Supervisor's position [7]. For example, plaintiff testified as follows during her deposition:

Q. Do you remember the interview for the Investment Fund Supervisor?

A. Vaguely.

Q. Question number two was, "Discuss your knowledge of investment principles, practices and state or federal laws pertaining to investments." Do you recall what your response was?

A. No, I don't know what my response was.

Q. If the forms indicate your response was, "none," would that be correct?

A. I can't believe that I said none, no. (Fair Tr. at 50–51).

The record, on the other hand, reflects that Mary Bridges was a close acquaintance of Gail Stone; and that Gail Stone served as Mary Bridges' supervisor for approximately eight years before Mary Stone was promoted to the position of Associate Director. (Stone Tr. at 21).

APERS cites the case of *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861 (8th Cir.1997), in support of its argument for summary judgment. In *Chock*, the Eighth Circuit observed:

Where, as here, the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision.

Inasmuch as the Court is of the view that the alleged circumstances that plaintiff had to contend with, in seeking the promotions in question, are diametrically opposite to the circumstances addressed by the Eighth Circuit in *Chock*, it would not be beneficial to make a comparative analysis of the qualifications of the candidates as set forth in the record. Significantly, in *Chock* the court found that "[the] Vice President typically interviewed the candidates...." for promotion before fol-

**7.** See APERS' Class Specification procedures which, among other things, confers unlimited discretion to the Qualifications Review Committee to substitute job related experience for basic requirements for the two positions in question. The provision states:

Other job related education and/or experience may be substituted for all or part of these basic requirements upon approval of the Qualifications Review Committee. (APERS' exhibits 2 and 3).

lowing the recommendation of a panel of management and human resources personnel that interviewed applicant for promotions. Moreover, the court further found that the procedures employed by Northwest Airlines, Inc., in determining applicants' abilities, qualifications and knowledge were "objective criteria." In this action, the evidence reflects that the Director of APERS, who makes the ultimate decision in filling positions, typically accepts and follows the recommendations of the Qualifications Review Committee without interviewing the candidates. In addition, the evidence reflects that the committee in this action, without the benefit of objective guidelines, employed subjectivity extensively and took for granted, in some instances, the selectees' experience and ability in concluding that the selectees were better qualified than plaintiff.

██ The Court finds that plaintiff presented evidence raising a genuine issue of material fact as to whether APERS' proffered reason for not selecting plaintiff to fill the positions applied for was pretextual. Accordingly, APERS' motion for summary judgment seeking dismissal of plaintiff's action is denied.